**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHAWN COREY CARTER,<br><br>*Plaintiff*,<br><br>v.<br><br>ANTHONY BUZBEE, DAVID FORTNEY, ANTHONY G. BUZBEE LP (d/b/a THE BUZBEE LAW FIRM), ANTIGONE CURIS, CURIS LAW, PLLC and JANE DOE,<br><br>*Defendants*. | Case No. 1:26-cv-02775-DEH<br><br>**THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Shawn Corey Carter, by and through his attorneys, brings this Third Amended Complaint against Defendants Anthony Buzbee ("Buzbee"), David Fortney ("Fortney"), Anthony G. Buzbee LP (d/b/a The Buzbee Law Firm) (the "Buzbee Law Firm") (collectively, the "Buzbee Defendants"), Antigone Curis ("Curis") and Curis Law PLLC ("Curis Law" and, together with Curis, the "Curis Defendants"), and Jane Doe, and alleges as follows based on knowledge as to his own acts and upon information and belief with respect to the conduct of others:

## INTRODUCTION

1. This case is about Defendants' deliberate misuse and corruption of the judicial process for unlawful and extortionate ends. Defendants knowingly sought to exploit—and attempted to profit from—the extreme reputational harm that would inevitably result from their filing of a sensational federal lawsuit in this District (No. 24 Civ. 7975; the "Underlying Action") falsely accusing Plaintiff Shawn Corey Carter ("Carter"), the artist professionally known as JAŸ-Z, of raping a minor. Their objective was clear: to extract an eight-figure settlement from Carter based on allegations they knew to be false.

2. When their initial attempts to extort Carter short of naming him as a defendant in a lawsuit failed, Defendants escalated their campaign and did just that. Thus, on December 8, 2024, Defendants—unconstrained by the truth or law, and seeking to monetize blatant lies—filed an amended complaint in their lawsuit publicly naming Carter as the previously unnamed "Celebrity A," whom they had accused of raping Doe when she was thirteen years old at an afterparty following the MTV Video Music Awards ("VMAs") on September 7, 2000.

3. These allegations were categorically false. At the time they filed their lawsuit, Defendants knew—or, at the very least, recklessly disregarded—that the accusations they had made were contradicted by publicly available information, internally inconsistent, and unsupported by any credible story or investigation. It was well-documented and easily verifiable, for example, that Carter was not present at the purported house party where Doe falsely alleges the rape happened, but rather was at the Lotus nightclub after the VMAs that year, and absolutely did not have contact with Doe. As the veneer of Buzbee's web of lies and ethical breaches began to crack, Defendants' scheme unraveled and, 68 days after falsely naming Carter, Defendants voluntarily dismissed their case with prejudice.

4. Indeed, when confronted with the mountain of evidence disproving her fabricated story, just one week after the voluntary dismissal with prejudice, Doe *admitted* in a recorded interview that it was all a sham, confessing that Carter "didn't sexually assault" her and that "Buzbee brought Jay-Z into it."

5. During that same interview, Doe revealed that Fortney came to see her in person on February 13 and (falsely) told her that it was critical that she immediately dismiss the case because "they told me Jay-Z was threatening to kill me." But Doe was no mere victim of Buzbee's and Fortney's misdeeds. When asked to put this into an affidavit, under oath, Doe's answer to the

interview laid bare her real motivation for participating in Defendants' conspiracy: "how does this help me?"

6. While Defendants' heinous actions constituted a gross abuse of the judicial system, which cannot be countenanced under any circumstances, they also inflicted grievous harm on Carter. Fueled by a press and a social media tour orchestrated by Buzbee, the accusations leveled against Carter ignited a firestorm of controversy worldwide, causing tremendous personal and professional reputational harm to Carter, his family, and his business interests. In today's world of instantaneous news and entertainment feeds on social media and elsewhere, the damage done to Carter and to those he loves and who love him as a father, husband, son, friend, and business partner was almost immeasurable. Carter, after all, did nothing to deserve the calculated attack on his character that Defendants carried out.

7. Buzbee was the central actor in Defendants' misconduct. For many years, Buzbee has made a business of threatening to file rape lawsuits against celebrities and others. As detailed below, Buzbee's pattern is well-established: he solicits potential plaintiffs over Facebook and other social media sites, teases the media with promises of explosive allegations, and then sends a short-fuse demand letter insisting on immediate payment. These high-pressure tactics are not good-faith attempts to settle legitimate claims—the purpose is extortion under threat of public humiliation and reputational destruction.

8. These are precisely the tactics Buzbee used against Carter here.

9. Just days after Sean Combs's arrest in 2024, Buzbee partnered with Andrew Van Arsdale, his law firm AVA Law Group, and his legal-marketing company Reciprocity Industries, LLC ("Reciprocity"), which specializes in identifying potential plaintiffs using television and social-media advertising (and that has also been the subject of prior controversies surrounding its

practices). Through Reciprocity, Buzbee quickly launched a nationwide campaign searching for anyone who claimed to have met Combs or attended one of his parties. Facebook and Instagram ads urged viewers to "find your voice" and "see if you qualify." Others featured stylized A.I.-generated images of Combs sitting inside prison cells. Defendants also promoted a 1-800 hotline for callers to report alleged misconduct involving other entertainers and celebrities. According to the New York Times, Reciprocity received around 26,000 responses to its advertisements, which were routed to its call-center in Billings and processed by approximately 70 employees working from a prepared script of intake questions.

10. Based on that process, and before any real investigation could possibly have been conducted, Buzbee began to publicly and repeatedly threaten that he would soon be suing unnamed "powerful people." On September 26, 2024, just one day after he began working with Reciprocity, Buzbee announced that he already represented more than fifty plaintiffs and warned that "many other individuals" would soon be implicated. Four days later, on September 30, 2024, he doubled-down on those statements, publicly claiming that his firm would soon be filing lawsuits on behalf of "well over 100 alleged victims" and announcing an upcoming press conference that would concern "other potential defendants." On October 1, 2024, Buzbee held a press conference in front of a backdrop featuring the 1-800 "hotline" number Reciprocity was using for Buzbee's solicitation campaign. Buzbee announced that he now represented 120 "vetted" and "corroborated" victims who were prepared to sue Combs and unnamed others.

11. His claims were preposterous on their face. In less than a week, Buzbee and Reciprocity had supposedly identified, interviewed, investigated, corroborated, and vetted 120 discrete claims of rape spanning decades and numerous alleged perpetrators, all of which would

have required extensive factual inquiries. There was no way a legitimate pre-suit investigation of that magnitude could have been conducted in that abbreviated timeframe.

12. Notwithstanding the impossibility of his claims, at the October 1 press conference, Buzbee said that additional lawsuits would soon follow and that "many powerful people will be exposed," including not only alleged perpetrators, but also individuals who he said had merely "attended" events with Combs. Over the next several weeks, on social media, cable television, podcasts, livestream interviews, and entertainment news outlets, including appearances on TMZ, CNN, Fox News, and NBC, he teased future lawsuits and unnamed defendants while promising that more "household names" would soon be revealed. When asked in an interview whether threatening sensational allegations through public lawsuits pressures targets into settlements and "becomes almost . . . the game," Buzbee said that "the system is the system" and if private "dialogue" fails, "we're going to file the case and we're going to pursue it with aggression."

13. That is precisely what he and the other Defendants did to Carter, even though there never was a shred of evidence to support the heinous false allegations that Buzbee and the other Defendants made against him. Over the course of his decades-long career, Carter has built a global reputation inside and outside of the music industry. He co-founded Roc Nation in 2008, growing it into the world's preeminent entertainment company. He also has major brand endorsements, international business ventures, philanthropic initiatives, and one of the most valuable personal brands in the world. Defendants thus knew, and tried to exploit, that the mere public allegation of raping a minor would threaten to destroy everything —Carter's family, friendships, and business relationships.

14. Among the thousands of individuals who contacted Reciprocity in response to Buzbee's solicitation campaign was Jane Doe. According to Van Arsdale's Affidavit, Doe retained

his law firm AVA Law on or around October 14, 2024 to pursue claims against Combs.[1] Van Arsdale later acknowledged publicly that Doe was one of the thousands who responded to Buzbee's Facebook ads. Doe would later confess to investigators that she did not independently identify Carter as an alleged perpetrator. Instead, Doe stated that "Buzbee brought Jay-Z into it."

15. Despite the gravity of the allegations Defendants filed in this Court, neither Buzbee nor any of the other Defendants conducted anything even approaching a pre-suit investigation. According to Defendants' own filings, Doe did not hire AVA Law and Buzbee until mid-October 2024, just days before Defendants filed their original complaint with an unnamed Celebrity A on October 20, 2024. In that extraordinarily brief period, Defendants supposedly investigated allegations dating back nearly 25 years, corroborated witnesses, assessed Doe's credibility, verified the timeline of her story, reviewed publicly available records and other information, and concluded there was a legally sufficient basis to accuse Carter—the unnamed Celebrity A—of raping a minor.

16. There was no such investigation. Even the most superficial review of Doe's story would have identified readily available information contradicting her narrative of that night's events, along with information about Doe's own background (a criminal record and a history of mental illness and making false claims of sexual misconduct) raising serious concerns about her credibility.

17. Nonetheless, Defendants filed their complaint on October 20, 2024, in the Southern District of New York against Combs and unnamed "Doe" defendants, including the unidentified

[1] Affidavit of Andrew Van Arsdale In the Matter of Jane Doe Claim (the "Van Arsdale Aff."), ¶ 4 ("the plaintiff identified as 'Jane Doe' . . . signed and retained AVA Law Group on October 14, 2024."). According to Van Arsdale, Doe came to AVA Law through the solicitation campaign the Buzbee Defendants, AVA Law, and Reciprocity had launched. Van Arsdale told *The New York Times* that Doe contacted "Reciprocity last fall after responding to a Facebook ad." Julia Jacobs, *Inside the Sean Combs Hotline: The Makings of a Mass* Tort, N.Y. Times (March 9, 2025) (the "March 2025 NYT Article"). According to Doe's father, however, Fortney initially solicited Doe as a client, and Doe "did not start any of this."

"Celebrity A." Although Carter was not publicly identified in the lawsuit, approximately seven weeks later, that changed as described below.

18. In the interim, on November 5, 2024, Buzbee sent Carter a demand letter accusing him of horrific conduct and demanding confidential mediation. According to the letter, Doe wanted "something of substance." The threat was crystal clear: unless Carter caved to Buzbee's extortionate demands, Defendants would publicly accuse him in federal court of child rape.

19. But Carter refused to be extorted. As a result, after weeks of publicly promising that additional famous names would soon be exposed, Defendants amended the complaint on December 8, 2024 to publicly name Carter as "Celebrity A," thereby falsely accusing him of raping Doe when she was thirteen years old.

20. The timing was no coincidence, as Defendants filed on the eve of the Hollywood premiere of *Mufasa: The Lion King* at the Dolby Theatre, where Carter and his wife were scheduled to celebrate their 13-year-old daughter's feature-film debut. Instead, on the eve of what should have been a proud and celebratory moment for the entire family, Defendants ensured that Carter and his family would walk into an international media firestorm fueled by accusations that Defendants knew were categorically false. This timing thus ensured that Carter would be immediately subjected to intense in-person scrutiny from both the media and important business associates.

21. The timing also coincided with the upcoming meeting of all NFL team owners, which was significant since Carter's company produces the Super Bowl halftime show for the NFL. This foreseeably caused the NFL to have to respond to media question, which Defendants believed would put pressure on Carter.

22. Hours after Defendants filed their amended pleading, the allegations against Carter were republished by international news outlets, discussed on podcasts, and smeared across every

major social-media platform. Business associates, lenders, investors, and others who worked with Carter and his company were forced to address the fallout created by Defendants' false accusations, which caused severe disruptions to Carter's business and significant financial injury, including more than $150 million in financing and contracts that evaporated.

23. As intended, Defendants' filing inflicted tremendous harm to Carter's reputation that persists to this day. But the damage was not merely economic. Defendants' allegations emotionally devastated Carter and his children, wife and family.

24. But Defendants did not stop there. On December 8, 2024, the Buzbee Defendants arranged and paid for Doe to travel to their office in Houston, Texas so she could participate in a televised NBC News interview in the presence of Defendant Fortney. During the interview, Doe added new, more serious allegations, including acts of physical violence, that she had never previously alleged. In an effort to engender sympathy, she appeared at the interview clutching a stuffed bunny despite the fact that her extensive social media presence contains no pictures of her holding one and this was a mere prop placed in her hands by Buzbee and Fortney for the express purpose of seeking to engender sympathy during the NBC News interview. But even as Defendants publicly increased the pressure on Carter by adding to their allegations, Defendants' story began to unravel.

25. It immediately became apparent that basic details of Doe's account were contradicted by publicly available information and video footage from the VMAs that year. To provide just a few examples: Doe claimed that the afterparty at which she was raped was held at a large white house with a gated U-shaped driveway located approximately 20 minutes away from Radio City Music Hall. But there are no houses like that anywhere near Radio City Music Hall in Manhattan (and certainly not within a 20-minute drive). Doe claimed she watched the VMAs on a

jumbotron outside the venue in Manhattan, but it was easy to confirm that there was no outdoor jumbotron near Radio City Music Hall that year because the requisite permit had been denied. Doe claimed that she spoke with Benji Madden at the afterparty about his tattoo of The Last Supper, but Madden was performing in Chicago that evening. And while Doe claimed her father drove overnight from Rochester to Manhattan to retrieve her after the alleged rape, her father stated after her NBC News interview that he had absolutely no recollection of such a trip and would not have forgotten something so significant.

26. Other aspects of Doe's account were internally contradictory or disproven by other information. For example, although Doe alleged that the rape occurred at a residence, which, as noted, does not exist, public records show that Carter did not attend a party at a residence on the evening of the alleged incident.

27. Days after her initial interview aired, NBC News confronted Doe with evidence undermining her fabricated narrative. Cornered, Doe admitted she "made some mistakes," walked back key parts of her story, and acknowledged that some of her account was not based on her own specific recollections. These lies are further underscored by the fact that Buzbee had just procured affidavits from Doe shortly before the NBC interview, so Doe's memory—had it been genuine—should have been fresh.

28. On February 14, 2025, Defendants abruptly dismissed the Underlying Action with prejudice. The timing was no coincidence. Buzbee dismissed the case only after his multiple streams of unlawful and unethical conduct began to show through and, indeed, he faced a deadline of being held to account for one of his ethical and rules breaches. Buzbee personally signed both complaints filed in the Underlying Action, but he was not admitted to practice in this Court. Judge Analisa Torres, who presided over the Underlying Action, ordered Buzbee to "file proof of

admission" to the SDNY by February 14, 2025. *See* Underlying Action, ECF No. 80. On February 13, 2025—the day before Judge Torres's deadline—Buzbee learned that his application for admission had been denied based on his prior misconduct, as discussed further below, and he proceeded to dismiss the Underlying Action—with prejudice and not pursuant to any settlement—the very next day.

29. One week later, Doe admitted to investigators that her allegations against Carter were false. In a conversation recorded on February 21, 2025, Doe recanted her story, confessed that Carter "didn't sexually assault [her]," and confirmed that "Buzbee brought Jay-Z into it." Indeed, she made clear that Buzbee was the one who "pushed" her to "go[] forward" with the false allegations against Carter. Doe also stated that Defendants falsely told her that Carter had threatened her, a fact invented by Defendants to pressure their own client into immediately abandoning the case. While Doe has attempted to walk back her admissions in a subsequent declaration, ECF No. 80-2, the recording captures Doe admitting that her claims against Carter were fabricated and were part of a conspiracy orchestrated by Buzbee to knowingly and maliciously assert false claims against Carter for settlement leverage.

30. Carter has been living a nightmare since the fall of 2024 based on the Defendants' vile, extortionate scheme. Defendants' conduct — incomprehensible to people of decency — left Carter with two choices: pay or fight. He could have paid the Defendants, which would have kept all of this out of the worldwide media, and avoided the public scrutiny, and intense personal anguish, that Defendants knew would rain down on him. But that was not an option for Carter, as he would not yield to extortionists. He could not and would not choose money over morality. That is not who Carter — a father, a husband, a son, a friend and a trusted business colleague — is. That does not comport with his strongly-held beliefs and values. So the only choice left was to

fight. This action is the culmination of that fight, and it is brought not only to redress the harm to Carter, but to bring an end to Buzbee's and his co-counsel's malevolent efforts to extort a payday by hiding behind the judicial process and a co-conspirator masquerading as a victim.

**PARTIES**

31. On the date of filing of this case, Plaintiff Shawn Corey Carter, professionally known as JAŸ-Z, was a citizen of the State of California. He is now a citizen of the State of New York.

32. Defendant Doe is a citizen of the State of Alabama.

33. Defendant Buzbee is an attorney. He is a citizen of the State of Texas. He is a principal of the Buzbee Law Firm.

34. Defendant Fortney is an attorney affiliated with the Buzbee Law Firm. Fortney is a citizen of the State of Texas.

35. Defendant The Buzbee Law Firm is a law firm organized and existing under the laws of the State of Texas, with its principal place of business in Harris County, Texas. The Buzbee Law Firm is a privately held limited partnership that has only two partners: Defendant Buzbee and non-party Services by AGB, L.L.C. Services by AGB, L.L.C. is a privately held limited liability company organized and existing under the laws of the State of Texas, and its sole member is Defendant Buzbee. Services by AGB, L.L.C. is thus a citizen of the State of Texas. Because the Buzbee Law Firm's two partners are citizens of the State of Texas, The Buzbee Law Firm is also a citizen of the State of Texas. Buzbee, his employees, and/or agents used The Buzbee Law Firm to orchestrate the conspiracy against Carter.

36. Defendant Antigone Curis is an attorney. She is a citizen of the State of New York. Curis is the sole member of Defendant Curis Law. Curis conspired with the Buzbee Defendants to extort Carter by, among other things, allowing the Buzbee Defendants, who were not authorized to

practice law in the Southern District of New York ("SDNY"), to use her electronic filing credentials to file Doe's complaint against Carter. On information and belief, Curis did not vet Doe's allegations before she filed her false complaints against Carter.

37. Defendant Curis Law is a law firm organized and existing under the laws of the State of New York, is a professional service limited liability company, with its principal place of business in New York, New York. Curis is Curis Law's only member. Because Curis Law's sole member is a citizen of the State of New York, Defendant Curis Law is also a citizen of the State of New York. Curis's conduct described in this Complaint was taken on behalf of herself, individually, and on behalf of Defendant Curis Law. On information and belief, Curis Law did not vet Doe's allegations before it filed a false complaint against Carter.

## JURISDICTION AND VENUE

38. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and this action is between citizens of different States.

39. On the date of filing of this case, Carter was a citizen of the State of California. No Defendant was or is a citizen of California. The Buzbee Defendants are citizens of the State of Texas, Doe is a citizen of the State of Alabama, and the Curis Defendants are citizens of the State of New York. Complete diversity of citizenship therefore exists among the parties.

40. This Court has personal jurisdiction over Defendants under New York law and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

41. Carter commenced this action in the United States District Court for the Southern District of Alabama, which transferred this action to the Southern District of New York pursuant to 28 U.S.C. § 1406(a) on March 31, 2026. ECF No. 91. In so doing, the Alabama court held that

"this case could have originally been brought in the United States District Court for the Southern District of New York and it is in the interest of justice this case should be transferred there," *id.* at 37, that "New York has an equal interest [in this dispute] and is a better forum," *id*. at 29, and that "all defendants would presumably be subject to [SDNY's] jurisdiction as the Curis Defendants are citizens and Doe availed herself to the jurisdiction with the [Underlying Action]," *id*. at 36; *see also* 28 U.S.C. § 1406(a) (authorizing transfer "to any district or division in which [a case] could have been brought").

42. The Curis Defendants are subject to the general jurisdiction of this Court. Curis is a citizen and resident of New York and was physically present in New York at all relevant times. Curis Law PLLC is an active New York Professional Service Limited Liability Company, organized under New York law, with its principal place of business in New York, New York.

43. The Buzbee Defendants are subject to specific personal jurisdiction in this Court pursuant to CPLR § 302. The Buzbee Defendants signed, filed, amended, and prosecuted the knowingly false claims against Carter in this District; paid the filing fee to invoke this Court's process; alleged claims under the New York City Victims of Gender-Motivated Violence Protection Act; sent the November 5, 2024 demand letter to Carter's counsel in New York; and deliberately used the Southern District of New York as the forum for allegations they knew would cause foreseeable injury to Carter in New York, where he maintains significant business operations and professional relationships. The Buzbee Defendants also conceded in briefing before the Southern District of Alabama that SDNY is a proper venue for this action. ECF No. 91 at 36.

44. Doe is subject to specific personal jurisdiction in this Court pursuant to CPLR § 302. Doe filed, amended, and prosecuted the knowingly false claims against Carter in this District; engaged the Buzbee Defendants and the New York-based Curis Defendants to bring and maintain

those claims here; directed those same counsel to send the November 5, 2024 demand letter to Carter's counsel in New York; alleged claims under the New York City Victims of Gender-Motivated Violence Protection Act in this Court; invoked the process of this Court; and alleged conduct supposedly occurring in New York. Doe repeated and amplified the same fabricated claim that Carter raped her in New York, causing foreseeable injury to Carter in New York, where he maintains significant business operations and professional relationships. Further, the Court may exercise pendent personal jurisdiction. *See Hanly v. Powell Goldstein, L.L.P.*, 290 F. App'x 435, 438 (2d Cir. 2008). Doe did not object to this case being transferred from the Southern District of Alabama to this District.

45. Venue in the Southern District of New York is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including Defendants' filing, prosecution, and dismissal of the knowingly false Underlying Action in this District, the sending of an extortionate demand letter to Carter's counsel in New York, and the making of false allegations about conduct Doe claims occurred in this District in 2000. In addition, the Curis Defendants, who are citizens of New York, reside in this District.

## DEMAND FOR JURY TRIAL

46. Carter demands a trial by jury of all issues so triable.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

### I. Carter Built His Life, Career, and Businesses on His Reputation

47. Carter's name and artistic moniker, JAŸ-Z, carry enormous commercial and reputational value that Carter worked to develop over decades as an artist, businessman, investor, and philanthropist.

48. In 2008, Carter founded Roc Nation, a full-service entertainment company through which he expanded into artist management, sports, media, consumer brands, and other business ventures.

49. Over the course of his career, Carter's reputation became central not only to his success as an artist, but also to the businesses, partnerships, investments, and philanthropic initiatives associated with his name. The credibility and public trust tied to that reputation have long been among Carter's most valuable professional assets. Defendants knew that publicly accusing Carter of raping a child would place extraordinary pressure on every aspect of the life and business empire he spent decades building—indeed, that was the whole point of what they were doing.

## II. In September 2024, the Buzbee Defendants Launch an Aggressive Campaign to Solicit Plaintiffs

50. On September 17, 2024, Sean "Diddy" Combs was arrested and charged in a three-count indictment with racketeering conspiracy, sex trafficking, and transportation to engage in prostitution. The charges predictably drew enormous public attention. Buzbee, for his part, saw an opportunity for easy money, and within days began moving to capitalize on the attention by assembling a plaintiff recruitment campaign targeting Combs and anyone else who knew him or had allegedly attended the same event as him.

51. Buzbee is a prominent Texas-based lawyer who publicly embraces his reputation as an aggressive, high-profile litigator. He frequently posts photos of himself traveling on his own private jet named "Lawsuit Air," which is painted with the image of a shark—the same motif that appears on Buzbee's website, where Buzbee describes his litigation style as "hit[ting] fast and exploit[ing] weaknesses."







52. On information and belief, about a week after the Combs indictment became public, Buzbee contacted Andrew Van Arsdale, an attorney and principal at AVA Law Group ("AVA Law"), to help generate civil claims against Combs.[2]

53. Van Arsdale's primary business is Reciprocity Industries, LLC ("Reciprocity"), a legal marketing firm that generates client leads through targeted television and social media advertisements. Those advertisements direct potential clients to Reciprocity's Montana call center, where employees conduct intake and purport to "vet" potential claims. According to Van Arsdale,

---

[2] March 2025 NYT Article ("About a week later, Mr. Van Arsdale said, Mr. Buzbee reached out. Years earlier, he said, Reciprocity had helped Mr. Buzbee with advertising on another mass-tort case").

Reciprocity employs about 70 people to answer calls around the clock, plus additional employees to "develop" cases.

54. In September 2024, the Buzbee Defendants, AVA Law, and Reciprocity agreed to work together to recruit plaintiffs willing to sue Combs and others associated with him. Under that agreement, Reciprocity would solicit and intake potential plaintiffs and then forward potential candidates to AVA Law and the Buzbee Defendants for possible lawsuits.

55. Reciprocity is a controversial player within an already controversial industry. In 2021, a former Reciprocity employee blew the whistle on Reciprocity's aggressive tactics in the Boy Scouts of America sexual abuse case. The whistleblower submitted an affidavit revealing that:

- The employee rejected approximately ten out of the 6,000 claimants that she spoke to. Reciprocity paid her $11 or $12 an hour, and a $200 weekly bonus if she signed up twenty claimants, and an additional $100 bonus for every ten claimants she signed up after the initial twenty. Reciprocity would "keep track of numbers," using "white boards everywhere in the office on which numbers of claims were written."

- Claimants signed contracts authorizing Reciprocity to keep 40% of any amount awarded.

- Reciprocity told employees that they could "push through Proofs of Claim without the claimants' signatures." In those cases, employees "electronically affixed" signatures to Proofs of Claim by copying them from contracts and pasting them onto claim forms.
- When claimants changed their minds about pursuing a claim or were told they did not qualify, employees were instructed "to leave the claim on file, but to inform the client that their claim had been canceled," even though they had not.

- At times, employees "were told to change the details of a caller's story in order to make their claims seem more viable."

56. Van Arsdale claims that Reciprocity stopped using "incentives" after the Boy Scouts litigation. However, he has also insisted that "[t]he same kind of rigorous vetting process that we have and exists today existed then." *See* March 2025 NYT Article.

### A. The Buzbee Defendants Retain Reciprocity to Conduct a Nationwide Search for Claimants

57. On information and belief, on September 25, 2024, the Buzbee Defendants hired Reciprocity to solicit potential plaintiffs to bring claims against Combs and others associated with him.[3]

58. Reciprocity, acting pursuant to its contractual relationship with the Buzbee Defendants, solicited potential plaintiffs with nationwide advertisements on Instagram and Facebook.[4]

59. The advertisements appealed directly to individuals who believed they may have encountered Combs or attended events associated with him. One advertisement read: "If you've been silenced, now is the time to find your voice." Another asked, "were you affected?" and included a link to "see if you qualify." The advertisements almost always included an A.I.-generated image of Combs; two depicted him in a jail cell:










[3] *See* March 2025 NYT Article (stating that Buzbee and Van Arsdale agreed to work together "six days" before they held a press conference on October 1, 2024, "in front of the sign featuring Reciprocity's 1-800 number.").

[4] Facebook and Instagram display ads to users based on the criteria selected by the advertiser, including, among others, the user's location.

60. In addition to the social media campaign, the Buzbee Defendants paid for and promoted a 1-800 "sexual abuse" hotline encouraging people to call if they believed they had claims against Combs or others, including individuals who had attended parties or events with Combs.

61. Responses generated through the advertisements and hotline were routed to Reciprocity's boiler-room call center where employees walked callers through a questionnaire entitled "Buzbee AVA Sean Combs Abuse:"




62. Defendants had no interest in the truth. As detailed in a Declaration filed in the Underlying Action (ECF No. 42-1), a whistleblower came forward with a damning account of the Buzbee Law Firm's practices. The whistleblower initially contacted the firm regarding trafficking and abuse allegations that were entirely unrelated to Combs or Carter. Yet Buzbee firm representatives repeatedly asked when she had met "Diddy"—despite her account having nothing to do with Combs. The Buzbee firm encouraged her to pursue claims anonymously, even though

she had no interest in doing so. When she expressed a desire to speak with law enforcement, she was told it was "not encouraged." In subsequent conversations, the whistleblower felt the Buzbee firm pressured her to fabricate allegations that she had been drugged, held down, and physically assaulted—allegations that were simply not true. When she refused to adopt the false version of events proposed by members of the Buzbee firm, she was summarily dropped as a client.

### B. Days After Hiring Reciprocity, Buzbee Publicly Claims He Represented 120 "Vetted" and "Corroborated" Claimants Prepared to Sue Combs and Others

63. On September 26, 2024, just one day after the Buzbee Defendants retained Reciprocity, Buzbee publicly announced on Instagram that the Buzbee Law Firm had been "associated by the AVA Law Group to act as Lead Counsel to pursue claims on behalf of more than fifty individuals." Buzbee also ominously warned that "many other individuals will be implicated."[5]

64. Four days later, on September 30, 2024, the Buzbee Defendants issued a press release announcing that they would soon file lawsuits on behalf of "well over 100 alleged victims." The press release also announced an October 1, 2024 press conference.

65. The September 30 press release made clear that the press conference would serve two purposes: (1) publicize the claims, and (2) generate more calls. The Buzbee Defendants announced that they would discuss "the various state laws that apply," publish "**the Sexual Assault Hotline, 1-800-200-7474**," and explain "the process when witnesses or victims call that number."[6] The Buzbee Defendants also promised to reveal "for the first time" information about "claims made by victims against Sean 'Diddy' Combs and other alleged perpetrators where rape, sexual assault,

[5] https://www.instagram.com/p/DAZpMyrJNAy/?hl=en.

[6] [6] *The Buzbee Law Firm and AVA Law Group to Release Information Regarding Pending Lawsuits Against Sean "Diddy" Combs* (Sept. 30, 2024, 07:00 AM), https://www.prnewswire.com/news-releases/the-buzbee-law-firm-and-ava-law-group-to-release-information-regarding-pending-lawsuits-against-sean-diddy-combs-302261930.html. AVA Law has been using the same 1-800 number for years. *See, e.g.,* https://x.com/AVALawGroup/status/1511833631014240256 (Apr. 6, 2022, 6:30 PM).

and sexual exploitation are alleged." To heighten public interest, the press release teased that the conference would include "information regarding other potential defendants."

66. On October 1, 2024—only "[s]ix days after Mr. Buzbee and Mr. Van Arsdale agreed to work together"—they held the promised conference. Mr. Buzbee stood in front of a sign "featuring Reciprocity's 1-800 number"[7] and announced that they represented 120 "corroborated, vetted" clients who intended to sue Combs. During the press conference, Buzbee was flanked by a representative from The National Victim Advocate, a recently formed organization with limited experience.




67. At the October 1 conference, Buzbee warned portentously that "[t]he day will come when we will name names other than Sean Combs," that "there's a lot of names . . . it's a long list already," and that "many powerful people will be exposed." He also stated that his clients intended to bring civil claims not only against Combs, but also against "many people and many entities" that would be named as defendants as the cases were filed. He further threatened that he would "find

[7] March 2025 NYT Article.

the silent accomplices" and "expose the enablers who enabled this conduct behind closed doors." Yet despite these sweeping proclamations, Carter was the only celebrity besides Combs whom Buzbee actually named in a lawsuit.

68. Buzbee's threats were not limited to people he claimed had personally committed rape. To the contrary, Buzbee repeatedly threatened to sue and publicly expose people who merely "attended" the same parties, were "in the room," "complicit," or otherwise connected to Combs. He warned that the people he intended to target "already know who they are," that they "should just come forward now," and that "you can't hide skeletons in the closet forever."

69. Buzbee then took his campaign to the press. Between October 1 and October 20, 2024, Buzbee gave at least ten national media interviews designed to publicize the hotline, generate more claims, and pressure unnamed targets who had not yet been sued. Those interviews included:

- **October 1, 2024:** Chris Cuomo;
- **October 2, 2024:** Elizabeth Wagmeister, CNN;
- **October 2, 2024:** Jesse Watters, Fox News;
- **October 2, 2024:** Sierra Gillespie, Law & Crime Network;
- **October 3, 2024:** Chris Hansen, TruBlu Streaming Network;
- **October 3, 2024:** Stephen A. Smith, *The Stephen A. Smith Show*;
- **October 7, 2024:** Harvey Levin, TMZ;
- **October 8, 2024:** Shaun Attwood, *Attwood Unleashed*;
- **October 8, 2024:** Piers Morgan, *Piers Morgan Uncensored*; and
- **October 20, 2024:** Chloe Melas, NBC News.

70. During his media blitz, Buzbee repeated the same threats. When asked whether the additional targets would include "[h]ousehold names," "celebrities," and "[e]xecutives in the entertainment industry," Buzbee answered: "All of the above. Yes." In another interview, Buzbee

stated that he was going to be "joining defendants in these cases that are going to raise some eyebrows," and how everybody was "tuned into, you know, who are the celebrities that might be named."

71. Buzbee also made clear that he was using the threat of criminal exposure as part of the same public-pressure campaign. In one interview, Buzbee warned that "whether they . . . can be criminally charged or even civilly sued, people should know, know that they knew and they didn't do anything about it." In another, he stated that "people right now who know that they were somehow involved" were "trying to distance themselves," but warned: "we know who they are or we will find out who they are." Buzbee added that "we're at the tip of the iceberg."

72. Buzbee further acknowledged the obvious reputational danger created by his public-naming strategy. In one interview, he admitted that the allegations are the type that would be "very hurtful to people if they're not true and very hurtful, frankly, if they are true." But Buzbee pressed forward anyway, publicly warning that additional people would be named in lawsuits, that some of the names would "shock" the public, and that some defendants would "raise some eyebrows."

73. The risk Buzbee acknowledged was precisely the risk he later weaponized against Carter: the threat that, unless Carter acquiesced to Buzbee's demands, Defendants would publicly name him in a federal rape complaint and cause irreparable reputational harm before the allegations could be tested.

74. Buzbee openly admitted the settlement-pressure mechanics of his strategy. When Harvey Levin asked Buzbee about the criticism that threatening to put embarrassing allegations in a complaint can force a settlement and "becomes almost . . . the game," Buzbee responded that it was "a fair point," adding that "the system is the system" and "[i]t's a gulag, if you will." Buzbee

then explained that he "always" attempts to resolve cases before filing suit, but if that effort fails, "we're going to file the case and we're going to pursue it with aggression." Buzbee described the pressure strategy plainly: if "dialogue" fails, "we just file a lawsuit."

75. Throughout these appearances, Buzbee falsely portrayed the claims as carefully screened and vetted.

76. Buzbee's public-threat strategy was not new. Courts and other litigants had previously criticized Buzbee for using media pressure, improper solicitation, and litigation threats in ways that mirror the tactics used against Carter here.

77. In one prior matter, an Iowa court revoked Buzbee's *pro hac vice* admission after finding a "pattern of ethical violations," including prohibited solicitation tactics and extrajudicial statements to the media that improperly asserted a foregone conclusion about the defendant's liability.[8] In another matter, Buzbee failed to disclose that revocation when seeking admission in federal court, prompting that court to refer the issue to the Chief Judge.[9]

78. These prior incidents mirror the tactics the Buzbee Defendants employed here: an explosive accusation, a private demand for confidential resolution, and the threat of a public filing that would trigger massive reputational harm. Indeed, Buzbee's prior conduct and public statements effectively spelled out the strategy he would use against Carter.

## III. Around October 14, Doe Responds to Buzbee's Solicitations

79. Defendants' solicitation campaign worked. According to Reciprocity, the advertisements and hotline generated about 26,000 contacts related to allegations concerning Combs. *See* March 2025 NYT Article.

[8] *Freeman v. Grain Processing Corp.*, Case No. LACV02123 (Iowa Dist. Ct. for Muscatine Cnty. July 1, 2012).
[9] *Haywood v. Univ. of Pittsburgh*, 2012 WL 6604646, at *2 (W.D. Pa. Dec. 18, 2012).

80. One of those 26,000 contacts was Jane Doe. On information and belief, on or around October 14, 2024, Doe retained Van Arsdale's law firm, AVA Law, to pursue claims against Combs. Van Arsdale Aff. at ¶ 4 ("the plaintiff identified as 'Jane Doe' . . . signed and retained AVA Law Group on October 14, 2024.").

81. According to Van Arsdale, Doe came to AVA Law through the very solicitation campaign the Buzbee Defendants, AVA Law, and Reciprocity had launched. Van Arsdale told *The New York Times* that Doe contacted "Reciprocity last fall after responding to a Facebook ad." *See* March 2025 NYT Article. According to Doe's father, however, Fortney initially solicited Doe as a client, that Doe "did not start any of this," and was told that her photographs were found in Comb's belongings.

82. Either way, Doe has since confirmed that she did not independently seek out the Buzbee Defendants to accuse Carter of anything. According to Doe, Buzbee was the one who brought Carter into the story. Doe further admitted that Carter "did not assault" her, but that Buzbee pushed her toward pursuing claims against Carter. When asked whether Buzbee "brought Jay-Z into it," Doe answered that Buzbee "was the one that kind of pushed me towards going forward with him, with Jay-Z."

83. After Doe was connected to AVA Law, Van Arsdale testified that AVA Law "vetted" Doe's story. Van Arsdale claims Doe was "interviewed and evaluated by an intake specialist as well as at least one attorney." Van Arsdale Aff. ¶ 6.

84. On information and belief, within days—if not hours—of Doe retaining AVA Law, a draft of Doe's complaint was sent to the Buzbee Defendants.[10]

[10] [10] Buzbee has testified that AVA Law referred Doe's case to him in "early October." Declaration of Anthony G. Buzbee, dated Jan. 22, 2025, *Doe v. Combs*, Case No. 24 Civ. 7975, ECF No. 76 (S.D.N.Y. Jan. 22, 2025) (the "Jan. 2025 Buzbee Decl."). Buzbee's testimony is contradicted by Van Arsdale's testimony that he only referred Doe's case to Buzbee after October 14, 2024.

85. Buzbee has since testified that, after he received the draft complaint from AVA Law, the Buzbee Law Firm "also engaged in further rigorous due diligence to investigate the veracity and legal viability of [Doe]'s claim" which included "[a]t least two attorneys [who] interviewed the plaintiff and fact-checked various aspects of her account." Jan. 2025 Buzbee Decl. ¶ 7. According to Buzbee, his firm "also engaged a retired police detective to gather facts about elements of Jane Doe's claim." Declaration of Anthony Buzbee, dated March 11, 2025.

86. Those statements are all lies. As described below, any "vetting" could only have occurred over, at most, a six-day period while Defendants were supposedly vetting hundreds of other potential plaintiffs. In any event, Defendants proceeded to file and publicize allegations they knew—or recklessly disregarded were—false anyway. At a minimum, Defendants were required to engage in rudimentary vetting, which they did not, and which would have revealed Doe's long-running and recent history of mental illness and multiple false and unfounded sexual assault allegations.

## IV. The Curis Defendants Join the Conspiracy And Enable the Underlying Action

87. Although Buzbee is admitted to practice in the State of New York, he has never been admitted to practice in the SDNY. Fortney is not admitted to practice in New York State or this Court.

88. Nevertheless, in their desire to file suit in the waning days of the extended statute of limitations provided for in the New York City Victims of Gender-Motivated Violence Protection Act, Defendants conspired to make use of Curis's admission to this Court and access to SDNY's electronic filing system to file the fraudulent and baseless claims against Carter in federal court, in a public filing available to anyone with a PACER account. In doing so, Curis furthered the aims of

the conspiracy by becoming a direct participant in her co-Defendants' scheme against Carter and aiding and abetting their actions to Carter's significant financial and personal detriment.

89. This was not an isolated incident. Judges in this District have previously found that the Buzbee Defendants used Curis and her ECF credentials to litigate in this Court while avoiding the rules governing admission to this District. In another Combs-related case, *McCrary v. Combs et al.,* Case No. 24 Civ. 8054 (S.D.N.Y.), the Buzbee Defendants and AVA Law used Curis's ECF credentials to litigate in this District even though Buzbee was not admitted. In *McCrary*, District Judge Mary Kay Vyskocil denied Buzbee's eleventh-hour motion for *pro hac vice* admission and his motion to withdraw. *Id*. ECF No. 76. In her Order, Judge Vyskocil found that:

- "Buzbee had previously improperly filed numerous actions in this Court and scores of submissions in this case and other cases, using the ECF credentials of another attorney, without having even applied for regular or pro hac vice admission to the United States District Court for the Southern District of New York." *Id*.
- Curis's "complicity" in Buzbee's "improper conduct may be grounds for sanctions." *Id*.
- Buzbee's application for admission to SDNY was "belated" and denied because "he had appeared in cases without seeking admission." *Id*.
- Curis filed an undated declaration attesting that Buzbee told her that he was never "denied admission" by any Court, despite the Grievance Committee's Order, which was annexed to Buzbee's Affidavit in support of his PHV motion, doing just that. *Id*.
- "Mr. Buzbee improperly filed and litigated this case using the ECF credentials of local counsel, whose apparent complicity in his improper conduct *may be grounds for sanctions*." *Id*. (emphasis added).
- "**Plaintiff's counsel is on notice that further failure to comply with the procedural rules that govern [SDNY] and her ethical responsibilities will have grave consequences.**" *Id*. (emphasis in original).

90. Curis, for her part, tried to minimize the problem. In a letter to Judge Vyskocil, Curis denied that Buzbee improperly filed and litigated the case using Curis's ECF credentials,

calling that assertion "simply not true." Curis represented that she "***reviewed all documents in this case and filed them under my ECF because I approved them***." *Id*. ECF No. 77 (emphasis added).

91. Judge Vyskocil was not persuaded. On March 28, 2025, she issued an Order to Show Cause requiring Buzbee's "local" counsel, Curis, to explain "why she should not be sanctioned for making false or misleading representations to the Court." *Id*. ECF No. 79. Judge Vyskocil explained that "Ms. Curis, who represents in her Letter that she 'reviewed' and 'approved' 'all documents' before filing them on ECF, filed a document that directly contradicted her own affidavit." *Id*. at 1-2. At the ensuing hearing on April 14, 2025, Judge Vyskocil stated:

> [Buzbee] then moved to withdraw his admission even though he never had been admitted. And I issued an order in which I simply reminded you, counsel, of your obligations to be careful about what you are filing. And I did call to your attention the displeasure about things being filed that had been signed only by Mr. Buzbee but that were filed under your ECF credentials. And rather than just taking to heart my calling to your attention potential issues, which may be happening in other cases as well, you chose to double down. And you filed a letter with the Court saying, "I review everything, and I approve it for accuracy."
>
> I don't know how you could have reviewed the *pro hac vice* application and confirmed its accuracy when right on top of your affidavit, which is undated, and simply /s/ signed. There was an affidavit from Mr. Buzbee saying that he had been denied admission to the Southern District, which is directly at odds with what he reportedly told you.
>
> *Id*. ECF No. 83.

92. Curis played the same role here. She lent the Buzbee Defendants access to this Court, filed Doe's false allegations against Carter, and gave the Buzbee Defendants the federal forum they needed to turn a baseless accusation into public leverage. In other words, Curis was an essential participant in the effort to weaponize this Court's docket. She knowingly and intentionally filed a complaint against Carter which contained false allegations, in an effort to pressure him into settlement. On information and belief, Curis never even met Doe—let alone vetted Doe's allegations—before filing this false complaint against Carter.

## V. Defendants Ignore Obvious Issues with Doe's Credibility and Narrative and Publicly Accuse Carter Anyway

93. By October 2024, public records showed that Doe was suffering with personal and financial hardships. At that time, she had already lost custody of her children, and her parents, who, on information and belief, supported Doe, had recently suffered their own financial hardships and filed for bankruptcy protection. Open-source information also revealed that Doe has a long history of mental health and substance abuse issues.

94. A simple Google search or other public record search by any of the Defendants of Jane Doe (using her real name) would have immediately raised legitimate questions about her credibility. Among other things, a basic pre-suit investigation would have identified records showing that: (a) 90 days before filing her lawsuit against Carter, Doe had been in Mental Health Court; (b) about 22 months before filing her lawsuit against Carter, Doe was charged with assault in the second degree and had attempted suicide; (c) Doe, according to the public testimony of her psychiatrist, suffers from several mental health disorders, takes multiple prescription medications and has a history of hallucinations; and (d) on three previous occasions, Doe has made unrelated false sexual assault allegations against others which were either dropped by her or dismissed by courts. Notably, Doe freely talked about many of these allegations on her social media but made no reference to the false allegations about Carter. Doe also discussed and promoted a pedophile on her social media. These circumstances called for careful, independent corroboration of Doe's allegations before any attorney could responsibly rely on her in accusing Carter or anyone else of one of the most serious crimes imaginable.

95. What's more, as detailed further below, key aspects of Doe's allegations are contradicted by publicly available sources documenting the night in question. The Buzbee Defendants and Curis Defendants had a duty to conduct a reasonable investigation before filing a

federal lawsuit accusing Carter of rape. Had they done so, that investigation would have uncovered that Doe's claims were false, which NBC News easily identified within 24 hours.

96. But rather than responsibly investigate, Defendants did the opposite. They solicited Doe, shaped her allegations, ignored obvious credibility problems, caused her to sign numerous knowingly false affidavits and used her as the vehicle for a public pressure campaign against Carter. Doe's allegations were not merely uncorroborated; they were blatantly contradicted by readily available records, witness accounts, and Doe's own later admissions.

### A. Within Days after Doe Retained Counsel, Defendants Filed the Underlying Action Against Combs and Unnamed Defendants

97. As alleged above, Doe retained AVA Law on or around October 14, 2024. Just six days later, on October 20, 2024, Defendants sued Sean "Diddy" Combs and his business entities, as well as "Does 1-10" in this Court. *See Doe v. Combs*, Case No. 24 Civ. 7975 (S.D.N.Y. Oct. 20, 2024), ECF No. 1 (the "Doe Complaint").

98. Defendants filed that fraudulent lawsuit with critical assistance from the Curis Defendants, who supplied the ECF credentials needed to place the pleading on this Court's public docket. That access allowed the Buzbee Defendants to proceed in this District even though they were and are not authorized to practice before this Court.

99. As part of Defendants' conspiracy to defraud and extort Carter, Doe's lawsuit initially implicated an unnamed "Celebrity A" and "Celebrity B," but it did not identify Carter by name. *Id*. ¶¶ 48-52. Instead, Defendants sued "Does 1-10," while leaving open the possibility of later naming additional defendants. As Defendants' subsequent conduct made clear, preserving Carter's anonymity at the outset allowed Defendants to retain the threat of publicly and falsely identifying him later if he refused to resolve the matter by submitting to their extortion demands

privately. Van Arsdale has since admitted that although Carter was not named in the lawsuit, Carter was "Celebrity A" and was one of the "Does 1-10."

100. Doe's original pleading set forth a facially impossible narrative. Doe claimed that, on September 7, 2000, when she was thirteen years old, a friend dropped her off near Radio City Music Hall in Manhattan in the hope that she might gain access to the VMAs. *Id*. ¶ 34. According to Doe, after she was unable to talk her way into the event, a limousine driver purporting to work for Combs invited her to an "afterparty." *Id*. ¶¶ 36-37. Doe further alleged that at around 9:30 or 10:00 p.m., the driver took her to a large white house with a gated U-shaped driveway located roughly 20 minutes away from Radio City Music Hall. *Id*. ¶¶ 38-40.

101. Doe further alleged that, after accepting a drink, she felt woozy and lightheaded and found what she believed to be an empty room. *Id*. ¶¶ 45-47. Doe then alleged that Combs and "Celebrity A" raped her while "Celebrity B" watched. *Id.* ¶¶ 48-52.

102. The timeline surrounding the filing of Doe's complaint undermines Defendants' later claims that they conducted any pre-suit investigation that "vetted" Doe's allegations. Buzbee has claimed that AVA Law referred Doe to him "in early October 2024" after AVA had "conducted an investigation." Declaration of Anthony G. Buzbee dated January 22, 2025 ¶¶ 5-6. But Van Arsdale later stated that Doe did not retain AVA Law until October 14, 2024. Van Arsdale Aff. ¶ 4. That left, at most, six days for AVA Law and the Buzbee Defendants to investigate Doe's allegations before filing the original complaint.

103. During that same brief, days-long period, the Buzbee Defendants also claimed to be vetting more than a dozen other Combs-related cases in New York state and federal court.[11] It

[11] During this six-day period, the Buzbee Defendants and the Curis Defendants supposedly "vetted" and filed ***thirteen*** other lawsuits against Combs and his entities. *See* Case Nos. 24 Civ. 7774, 24 Civ. 7777, 24 Civ. 7769, 24 Civ. 7778, 24 Civ. 7776, 24 Civ. 7772, 24 Civ. 7974, 24 Civ. 7976, 24 Civ. 7973, 24 Civ. 7977, and 1:24-mc-00478 filed in SDNY; and Index Nos. 159915/2024 and 159914/2024 filed in the Supreme Court of New York.

was not reasonably possible to meaningfully investigate Doe's extraordinary allegations against Carter while simultaneously vetting that volume of other cases, particularly where the allegations concerned events supposedly occurring more than two decades earlier.

104. Buzbee's public statements further undercut Defendants' claim that they conducted a reliable investigation. During his October 2024 media tour, Buzbee admitted to journalist Chris Hansen that he had received unsolicited materials through email and social media, including "videos and pictures and stuff" that were "without context" and difficult to understand. Yet Defendants still proceeded to file Doe's complaint and later used the allegations as leverage against Carter for "settlement" leverage.

### B. Doe and the Buzbee Defendants Sent Carter an Extortionate Demand Letter Threatening Public Accusations

105. A few weeks after filing her complaint, Doe and the Buzbee Defendants sent Carter a demand letter on November 5, 2024, accusing him of raping Doe as a minor and threatening to publicly identify him if the matter was not resolved confidentially.[12] The Buzbee Defendants claim that Fortney and a Buzbee Law Firm associate obtained Doe's permission to send the letter on a phone call on or around November 4, 2024.[13]

106. The letter repackaged many of the allegations from Doe's public complaint against Combs and "Does 1-10," including allegations that later changed when Doe amended her pleading. The message was unmistakable: unless Carter paid, Defendants would amend Doe's complaint to unmask Carter as "Celebrity A" and add Carter as a named Defendant.

[12] Doe did not reveal her name in the demand letter.

[13] Defendants also sent a second demand letter alleging that Carter and an unnamed woman assaulted a "John Doe" victim in California in 2015. Like the Jane Doe letter, these allegations are entirely false. Defendants have not pursued the allegations in the John Doe letter.

107. Defendants used the already-filed complaint as leverage. Doe and her lawyers threatened to "take a different course" unless Carter agreed, by November 19, 2024, to participate in "confidential mediation" to "resolve this delicate and important matter." That gave Carter only two weeks to avoid public exposure. And the price was clear: Doe "want[ed] something of substance" by way of a settlement.

108. However, as discussed *supra*, Doe and her lawyers had ***already*** sued Carter, albeit as one of the "Does 1-10." Defendants' plan was thus clear. They demanded Carter either: (a) pay "something of substance" to stop Doe from making public the wildly false allegations of rape that would subject Carter to public humiliation and irreparably harm his reputation, family, career, and livelihood; or (b) endure catastrophic financial and personal ruin. The Buzbee Defendants' statements and correspondence made clear the immediate and real threat of public exposure if Carter failed to pay.

109. The Buzbee Defendants' demand letter was designed to force Carter into a confidential process before they would provide meaningful corroboration.

110. This framework was not a legitimate effort to evaluate Doe's claims. It was the same public-pressure strategy Buzbee had spent weeks advertising in the press: threaten a catastrophic public accusation, withhold meaningful information unless the target entered a confidential process, and then use the threat of public ruin to extract a settlement. In other words, blackmail.

### C. Doe Amends Her Lawsuit To Allege That Carter Was "Celebrity A"

111. Unwilling to capitulate to Defendants' extortion, on November 18, 2024, Carter filed a lawsuit against Buzbee for Extortion and Intentional Infliction of Emotional Distress based on the letters he had received from the Buzbee Defendants. *See Carter v. The Buzbee Law Firm*,

No. 24SMCV05637 (Sup. Ct. Cal. 2024). In that action, Carter explained that through the letters described above, Buzbee was "shamelessly attempting to extort exorbitant sums from him or else publicly file wildly horrific allegations against him."

112. On December 8, 2024, Defendants, humiliated and exposed by Carter's lawsuit, filed an amended complaint, revealing what Carter understood all along—that one of the anonymous "Does" defendants had been used as a sword of Damocles over Carter's head as a threat of what would happen if he did not succumb to the extortion scheme. *See* Underlying Action, ECF No. 29.

113. Doe's amended complaint made wild, horrific, but utterly false allegations against Carter, identifying him by name as the previously described "Celebrity A" from the original complaint.

114. Defendants also added new, demonstrably false factual allegations, including that during the VMAs, Doe, "without a ticket, remained outside with others and watched the VMAs on a jumbotron." *Id.* ¶ 40.

115. Defendants' intent was clear: to cause maximum harm to a remarkably successful businessman who is at the very top of the music industry and the business world, and who is unrivaled in fame and influence, all in an effort to place Carter in such fear for his reputation that he would capitulate to their unlawful monetary demands.

116. Defendants thus knowingly filed a false complaint naming Carter not to obtain judicial relief, but as a vehicle to publish and disseminate Doe's implausible and false rape accusation and as a device to shield her later defamatory statements to the press. By cloaking Doe's fabricated narrative in the form of a federal court pleading, Defendants weaponized the judicial process itself: they leveraged the litigation privilege to broadcast otherwise actionable accusations

with impunity, lent a shroud of legitimacy and judicial imprimatur to allegations they knew (or recklessly disregarded) to be false, and ensured that every news outlet, social media platform, and commentator could republish the complaint under the protective banner of "court filings." In short, Doe and her co-conspirators exploited the courthouse not as a forum to vindicate any genuine grievance, but as a publication platform—using the complaint to manufacture judicial cover for a defamatory narrative they intended, from the outset, to amplify in the press and use as leverage to extract a settlement from Carter.

## VI. A Simple Google Search Or Other Basic Investigation Would Have Revealed That Doe's Allegations Against Carter Were Demonstrably False

117. The allegations made by Doe against Carter are false, defamatory, and easily refutable. Defendants allege facts that are implausible and defy both logic and common sense. A cursory review of the allegations alone proves that Doe's claims are demonstrably false. Public information, available by a simple Google search, confirmed the same.

118. The decision to file the lawsuit anyway makes clear the true motive in filing the suit: to extort and defame Carter while using the courts to try and shield their misconduct. Indeed, Defendants knew full well this was not a triable case and had no chance of success on the merits, but they filed it anyway because they never had any intention of litigating this matter, further evidenced by the fact that Buzbee was not admitted to practice in the SDNY, neither Buzbee nor Curis met with Doe before filing the Underlying Action and once the extortion scheme was laid bare, Defendants rushed to dismiss the lawsuit with prejudice. Defendants' allegations against Carter were made in bad faith, with malicious intent, without probable cause to believe that the claims would succeed and were a perversion of the judicial system designed by Defendants to evade the consequences of their conduct, which was laid bare in a sanctions motion in the Underlying Action.

119. ***First***, although Doe alleged that the rape occurred at a residence, public records show that, other than Gracie Mansion, there was no residence in Manhattan matching Doe's description anywhere within a 20-minute drive of Radio City Music Hall and Carter did not attend a party at a residence on the evening of the alleged incident. Indeed, NBC News easily located photos of Carter from that evening showing him at a party at a commercial location—the now-closed Lotus nightclub in New York City.[14] Of course, a private nightclub cannot be mistaken for "a large white residence with a gated U-shaped driveway" that included "a large living room or foyer," and had "a hallway containing several rooms off of it," and a bedroom. Doe Am. Complaint ¶¶ 44, 46, 51. Even Buzbee was forced to admit to NBC News that Doe does not claim the rape occurred at Lotus nightclub.

120. ***Second***, Doe told NBC News and alleged that the drive to this residence was "approximately twenty minutes." Doe Am. Complaint ¶ 44. Public records show that there are no houses matching Doe's description within 20 minutes of Radio City Music Hall. Without even reviewing public records, Defendants alleged facts that defy common sense—that Doe somehow drove to a suburban home with a driveway from Midtown Manhattan in twenty minutes. However, when pressed about these details in a follow-up interview with NBC News, Doe admitted she did not know where she was going or even how long the drive took. Worse, she conceded to NBC News that she "guessed about the length of time the trip had taken [as set forth] in the lawsuit."

121. ***Third,*** Doe alleges that after the VMAs began, "much of the crowd moved inside, but [Doe], without a ticket, remained outside with others and watched the VMAs on a jumbotron." Doe Complaint, ¶ 40. This description of events, like many others, is easily refutable. Moreover,

[14] Chloe Melas, et al., *Jay-Z rape accuser comes forward to NBC News, acknowledges inconsistencies in her allegations*, NBC News (Dec. 13, 2024, 7:27 PM), https://www.nbcnews.com/news/us-news/jay-z-rape-accuser-comes-forward-nbc-newsacknowledges-inconsistencies-rcna183435 (the "NBC News Article").

the broadcast of the 2000 VMAs—which is publicly available on YouTube—conclusively shows that there was no jumbotron on site. Indeed, the producers of the 2000 VMAs and the NYPD confirmed that there was no jumbotron set up that night as the producers had applied for a permit to set up a jumbotron for that evening, but the application was denied.

122. ***Fourth***, Doe alleges that after the attack she ran "until she reached a gas station," and called her father, who then "arrived to pick her up shortly before dawn." Doe Complaint ¶ 60. Based on "their [then] address [in Rochester, New York]," Doe's father would have had to have driven at least 5 hours and 47 minutes and hundreds of miles to pick her up. When questioned about the alleged pre-dawn pick-up and drive home with Doe after the alleged rape, Doe's father told NBC News that he does not recall picking up Doe, which (unsurprisingly) he said would have been "something that would definitely stick in my mind." Doe's father also said that he first learned of the alleged rape when Doe gave an interview to NBC News on December 13, 2024 ("Texas Interview"), and that he did then recall picking Doe up in the middle of the night on one occasion, but it "was a local drive." It strains credulity that Defendants would not have learned that Doe's father had no recollection of a key aspect of Doe's story during their "vetting" process.

123. ***Fifth***, even assuming Doe was outside the VMAs that evening, it was impossible for her to have approached celebrity limousines as she claims, because publicly available video of the VMAs shows that the limousines were only outside of Radio City Music Hall briefly for celebrity pick up and drop-off, and the crowd of fans were staged across the street and blocked off from the limousine drop-off and pickup area. In any event, after drop-off, the celebrity limousines were moved to an area that was separated from fans by police barricades, as publicly available video of the event clearly shows, and thus were not accessible.

124. ***Sixth*,** during the NBC interview, when asked to provide greater detail about the purported afterparty where she claimed to have been raped, Doe described an alleged conversation she had with the singer Benji Madden about his tattoo of The Last Supper. However, Benji Madden's tour schedule, which is publicly available online, established that Madden and his brother were touring in Chicago and could not have been in New York that night.[15]

125. Further, a representative for Madden confirmed to NBC News that neither he nor his brother Joel attended the 2000 VMAs and that they (and their band Good Charlotte) were on tour in the Midwest at that time. When confronted with this evidence during the interview, Doe conceded she "may have made a mistake in identifying" them and that not all the faces at the afterparty were "as clear."

126. Defendants also amended their pleadings in ways that evidence their awareness of the falsity of Doe's narrative.

127. In the Original Complaint, Defendants alleged that Doe spoke with a limousine driver who told her to return after the VMAs around "9:30 or 10 p.m.," and that he would take her to a party then. Doe Complaint ¶ 38. Defendants then alleged that Doe "excitedly returned to the driver, who drove her alone in a black limousine with black interior." *Id.* ¶ 39. This would have been factually impossible given the fact that the VMAs ended at 11:11 p.m. that night.

128. On amendment, recognizing they had revealed themselves, Defendants attempted to mask the impossibility of their original allegations by removing any allegations of specific times, alleging instead that "[l]ater that evening," Doe returned to the same spot to meet the driver and

[15] *Good Charlotte's 2000 Concert History*, CONCERT ARCHIVES, https://www.concertarchives.org/bands/good-charlotte?page=4&year=2000#concert-table (last visited May 21, 2026) (listing Good Charlotte performance at The Vic Theatre in Chicago, Illinois, on September 7, 2000).

"waited for what seemed to her a long time," before she was driven to the purported party. Doe Am. Complaint ¶ 43.

129. However, even in this version of events, Defendants' allegations are still factually implausible. Defendants allege that the limousine driver had to first drive "Combs and others to the afterparty," and then afterwards took Doe to the party. *Id.* ¶ 42. The VMAs ended at 11:11 p.m., which means the earliest Doe could have arrived at the afterparty, by her own account, is 12:11 a.m. (the driver had to drive to the residence, back to Radio City Music Hall, and then back to the residence and Defendants allege that the drive was approximately 20 minutes). Yet, later Doe alleges that she called her father to pick her up and that after an over five-and-a-half hour drive he "arrived to pick her up shortly before dawn." *Id.* ¶ 60. This would mean that she would have had to call her father no later than 12:48 a.m., so all of her allegations about the party: mingling with celebrities, drinking a reddish-yellow mixture, finding a room to lie down in, Carter's rape, Combs's attempted rape and ensuing physical fight, and Doe's escape and run to the gas station all took place in seven minutes. These allegations are physically impossible.

## VII. Doe Defames Carter on Global Television

130. In the second week of December 2024, the Buzbee Defendants paid for Doe to travel to the Buzbee Defendants' offices in Houston, Texas to sit for the Texas Interview with NBC. Buzbee spoke with Doe in person ***for the first time*** during that trip to Texas—nearly two full months after Doe contacted AVA Law.

131. Critically, Buzbee and Doe first met in person to discuss the case: (a) ***after*** Buzbee went on a public media crusade threatening anyone and everyone that attended a party that Combs also attended; (b) ***after*** Defendants sued Carter as one of "Does 1-10" and Buzbee sent an extortionate demand letter to Carter; (c) ***after*** Defendants filed an amended complaint naming

Carter; and (d) ***after*** Buzbee told TMZ that he had not ruled out filing a criminal complaint and that "[w]hat happens next is up to my client." Defendant Buzbee's conduct violated New York Rule of Professional Conduct 3.4(e) and Texas Disciplinary Rule of Professional Conduct 4.04(b) prohibiting a lawyer from presenting or threatening to present criminal charges solely to obtain an advantage in a civil matter.

132. On December 13, 2024, Doe sat for the Texas Interview with NBC News, which was conducted with Fortney by her side. As part of the Texas Interview, NBC News honored Doe's request to conceal her identity. Additionally, NBC News published a story excerpting interviews it held with Doe in Texas. Doe stated that she decided to speak to NBC News in Texas "for the first time," because she had "been quiet long enough."

133. During the Texas Interview—which Buzbee orchestrated, which Doe attended on a voluntary basis with the aid and encouragement of the Buzbee Defendants, and which occurred in the presence of Fortney in Texas—Doe made multiple, maliciously false statements about Carter outside any judicial proceeding.

134. Doe, in addition to attempting to explain the impossible—how she, as a 13-year-old from upstate New York, wound up in Manhattan (over 300 miles and over five-and-a-half hours away by car) at a private VMAs afterparty with countless celebrities—told NBC News in Texas that she spoke with musicians Benji Madden and his brother at the afterparty. Doe said she recalled talking to Benji Madden "about his tattoo, . . . [of] 'The Last Supper,'" because she has a "religious background so it was something to talk about." Notably, these allegations were not included in Doe's complaint and were made for the first time during the Texas Interview.

135. Indeed, far from simply repeating the allegations in her complaint, Doe unleashed entirely new, but equally false, allegations against Carter during the Texas Interview—allegations

that go well beyond those contained in her complaint. Doe stated, for the first time, that she had been ***"fighting trying to get away from [Carter] and he put his hand over my mouth."*** Doe also stated, for the first time, that Carter ***"told me to stop it—you know, stop it, cut the BEEP."*** She also provided other, previously undisclosed, details about herself and her alleged "encounter," including that she:

a. Is "A 38-year-old mother from Alabama."

b. Allegedly went to the VMAs "to catch a glimpse of her favorite celebrities."

c. Was not scared to be alone in New York because "with having autism, is—like feeling you live your life in a shatter-proof, juggle ball. The world's on fire, the fire is inside the ball with you, but there's no way for you to get out."

d. "[S]uffered a head injury."

e. Was driven by a friend "from Rochester, New York to Manhattan."

f. Believed Mr. Combs's limo driver attempted to convey that she "was just pretty."

g. Had to "seek medical treatment due to the stress."

136. During the Texas Interview, Doe did not merely repeat allegations from her complaint. Doe added new allegations, new details, and new attempted corroboration that did not appear in the Underlying Action, including that she had a drink "that made her feel woozy," after which "Combs and Carter took turns raping her" while an unidentified female celebrity watched. Doe also told NBC News that following the alleged rape, she found her way to a gas station where she called her father who picked her up and drove her home.

137. Doe attempted to explain, for the first time, why she could produce no witnesses to this alleged rape. First, Buzbee, through a statement issued to NBC News on Doe's behalf, alleged that the "friend" who allegedly drove Doe from Rochester to New York City the night of the alleged rape "has since died." Second, during the Texas Interview, Doe stated, for the first time, that after

her father picked her up from the afterparty, they "[r]ode home in silence" and that her father "didn't ask me what happened, he didn't ask me what I did or where I was."

138. These were new factual assertions, not reports of judicial allegations. Doe and the Buzbee Defendants used the Texas Interview to bolster Doe's false story in ways no pleading had done: by offering explanations for missing witnesses, adding emotional details about Doe's father, and presenting Doe's accusations as a personal, public account rather than a summary of filed allegations.

139. Thus, far from providing NBC News with a "report" about the Underlying Action, Doe used the Texas Interview to broadcast a new, first-person narrative of her supposed experience and purported motivations for coming forward "for the first time." She leveled new, more graphic accusations against Carter that she had not raised in the Underlying Action, including claims that, during the fabricated incident, she was "fighting trying to get away from [Carter] and he put his hand over my mouth," and that Carter "told me to stop it—you know, stop it, cut the BEEP." She also introduced new facts regarding her autism diagnosis and head injury and manufactured a purported corroborating "witness" for her story. Those statements did not fairly summarize the Underlying Action. In fact, they materially expanded it.

140. After the disastrous Texas Interview, and in furtherance of their conspiracy, Fortney admittedly met with Doe. Affidavit of David Fortney, dated April 4, 2025, ECF No. 21-1 (the "Fortney Aff."), ¶ 1.

141. In a follow-up interview of Doe by NBC News within 24-hours, Doe was confronted with a mountain of evidence contradicting her story, which NBC News uncovered in less than a week following the initial interview. The inconsistencies NBC News identified were not obscure or hard to find; NBC News uncovered them in a matter of days. Among other things, NBC

News located photographs placing Carter at a different venue, confirmed that a celebrity Doe claimed to have seen was not at the VMAs, and obtained a statement from Doe's father that he did not recall making the multi-hour round-trip drive Doe described.

142. In response to irrefutable proof of her lies, Doe admitted she "made some mistakes." She then shockingly disavowed her allegations about the location of the alleged incident and admitted she was just guessing.

143. Even after being confronted with her lies, Doe did not drop her baseless complaint. In fact, even after NBC News questioned the new, false allegations made during her interview, Doe stated: "[I] stand[] by [my] statements [during the Texas Interview]" and that "what is the clearest is what happened to me." Defendants instead insisted on moving forward, and promised that Doe would submit to a polygraph. Defendants have unsurprisingly not revealed whether Doe took or passed her polygraph test.

144. The Texas Interview was not ancillary to the Underlying Action. It was a separate defamatory publication designed to amplify and expand Doe's false allegations outside court, increase public pressure on Carter, and cause the very reputational harm Defendants had threatened if Carter refused to pay.

## VIII. Doe Waited Months Before Dismissing Her False Complaint, And Did So After Being Lied To By Her Attorneys For Their Own Benefit

145. Beginning in November 2024, Carter made several court filings in which he vehemently denied Doe's claims, pointing out the huge inconsistencies in her story and the utter baselessness of various allegations.

146. At each of these junctures, Doe was confronted with the false nature of her claim, as well as the harm it was causing Carter. At any of these points, Doe could have withdrawn her

lawsuit. Undeterred, Doe continued to pursue her claim without regard to the harm it was causing or could cause Carter.

147. Having already (1) sent the November 2024 false and defamatory demand letters; (2) filed the false and defamatory complaint and amended complaint; and (3) conspired with Doe to give the false and defamatory Texas Interview to NBC News, Defendants were intent on perpetuating Doe's lies, as the co-conspirators firmly believed that the public pressure of the story would force Carter's hand, leading to a payout.

148. Indeed, on December 10, 2024, before any substantive discussion with Doe about her allegations and despite obvious red flags undermining her story, Buzbee, already fully aware of the falsity of Doe's allegations, told TMZ that Doe was "not ruling out filing rape charges" against Carter, and that "[w]hat happens next is up to my client. It's her case and what she decides to do you will find out in due course."

149. Despite the setbacks, Buzbee pressed forward with Defendants' conspiracy unabated. Buzbee signed both complaints and other filings in the Underlying Action without being admitted to the SDNY, as required. When the Hon. Analisa Torres, the District Judge presiding over the Underlying Action, was advised of this fact, she ordered Buzbee to "file proof of admission [to SDNY] on the docket" by February 14, 2025. *See* Underlying Action, ECF No. 80.

150. The very next day, January 29, 2025, Buzbee applied for such admission.

151. Then, on February 1, 2025, Buzbee's personal outside counsel informed Carter's counsel in the Underlying Action that Defendants were dropping the Underlying Action.

152. On February 13, 2025—one day before his court-ordered deadline to file proof of admission in SDNY—Buzbee was notified that his application for admission to the SDNY Bar had been denied because he had already improperly filed pleadings in the Underlying Action and in

more than 20 other SDNY cases without being admitted to that Court. *See McCrary v. Combs*, Case No. 24 Civ. 8054 (S.D.N.Y. Feb. 13, 2025), ECF No. 49-6 (the "Denial Order"). Buzbee was also instructed to attach a copy of the Denial Order to any subsequent application for admission in a particular case in SDNY.

153. Faced with his inability to comply with Judge Torres's order in the Underlying Action, and facing the threat of punishment by the court, Buzbee dispatched Fortney to meet with Doe that same day, namely February 13, 2025. *See* Fortney Aff. ¶ 9.

154. Fortney met with Doe again on February 13, 2025. On information and belief, he did so at Buzbee's direction and for the express purpose of concealing the conspiracy by deceiving Doe about the true reason for seeking dismissal of the Underlying Action. This was not a legitimate attorney-client meeting conducted in furtherance of Doe's representation. It was a meeting held in furtherance of the very conspiracy at issue in this lawsuit.

155. On information and belief, during that meeting, Fortney falsely, maliciously, and manipulatively told Doe that the Underlying Action needed to be dismissed because Carter had made threats against Doe's life, and it was too dangerous to continue with the Underlying Action. Of course, no such threats had ever been made.

156. Rather, the Buzbee Defendants and Curis Defendants were desperate to withdraw their fraudulent case to avoid being punished by Judge Torres for filing a false pleading without Buzbee even being admitted in SDNY, which would jeopardize their ability to continue with the more than 20 other cases they had pending in SDNY.

157. Thus, on the evening of Friday, February 14, 2025, Doe filed her voluntary dismissal with prejudice as the Buzbee Defendants had stated he would on February 1, 2025. *See* Underlying Action, ECF No. 91.

## IX. Doe Admits That Her Accusations Are False

158. On February 21, 2025, during an interview outside her house, Doe confirmed to investigators that she had dropped the suit because her attorneys had told her that Carter had threatened her life. She also admitted that the idea to include allegations about Carter had come from Buzbee and that Carter had not raped her.

159. When investigators asked, "But Jay-Z had nothing to do with this, correct?" Doe answered: "Right." When asked, "So I mean, he did not assault you?" Doe confirmed: "No." Later, when investigators clarified that they were not asking Doe to deny that something happened to her, but only to confirm "that Jay-Z did not have anything to do with it" and "that he didn't sexually assault you," Doe agreed that was "a fair assessment."

160. Doe also admitted that the Buzbee Defendants manipulated her with outrageous threats on her life that they falsely attributed to Carter. Doe stated that "the lawyers" told her Carter was "threatening to kill" her. When asked whether Buzbee told her there were threats against her life, Doe answered yes, and stated that she was told "saying anything else could get [her] in a lot of trouble" and that Carter "could come after [her]."

161. Doe's father independently corroborated that the attorney Defendants told Doe and her family that Carter had threatened her life. He stated that Doe dismissed the Underlying Action "[b]ecause of some threats," including "very, very, very serious threats" to her "life and family." He further stated that "David [Fortney] got on a plane and flew all the way out here to take her through the threats," then flew back the same night. That meeting took place the day before the dismissal of the Underlying Action. Those supposed threats, however, were fabricated by the Buzbee Defendants to frighten Doe and keep her aligned with Defendants' false narrative against Carter, and also are eviscerated by the February 1 statement from Buzbee's personal lawyer that they would be dismissing the Underlying Action.

162. These admissions confirm that Doe's continued pursuit and eventual dismissal of the Underlying Action were not good-faith claims, but instead were the result of Defendants' manipulation of an unreliable witness whose allegations Defendants had shaped, amplified, and used against Carter.

163. In short order, Defendants were made aware that Doe had admitted Carter did not rape her. Their threats and extortionate pressure campaign against Carter continued regardless.

164. On Friday, February 28, 2025, after Doe admitted to fabricating her claim against Carter, and after Buzbee, Fortney, and Curis became aware of those admissions, a prominent New York attorney serving as the Buzbee Defendants' co-counsel, called an attorney for Carter. During that call, the Buzbee Defendants' New York co-counsel threatened that if Carter's attorneys filed anything in Carter's pending extortion and defamation case in California against Buzbee related to the statements made by Doe fully exculpating Carter and inculpating her and Buzbee in an extortion conspiracy, that Buzbee would issue a public statement by Doe that: (1) she was being threatened by Carter's "people" since she dropped the lawsuit; and (2) she dropped the lawsuit only because she was afraid for her life and that the allegations she made against Carter in the lawsuit were all true.[16]

165. Fortney met with Doe to convince her to drop her lawsuit. He did this by falsely telling Doe that she could "get in a lot of trouble," and indeed that Carter was going to kill her. Of course, all allegations about Doe's life being threatened by Carter's "people" and her newly claimed reasons for dropping the lawsuit, are, and always were, false. When Buzbee, Fortney, and their New York co-counsel repeated or threatened to repeat that narrative, they knew it was false. Indeed, no such allegations were brought to the attention of the Court in the Underlying Action.

[16] Carter first became aware of Doe's identity on or around February 21, 2025; and has never met or interacted in any way with Doe.

166. The Buzbee Defendants have since pivoted to a new explanation for the dismissal and now claim that Doe only dropped her lawsuit against Carter in furtherance of a "negotiated dismissal" agreed to on February 4, 2025. However, this is also untrue—there was absolutely no "negotiated dismissal" or settlement of any type. Indeed, the Buzbee Defendants' counsel acknowledged in writing that there was no settlement. *See* Declaration of Alex Spiro, dated March 14, 2025 ¶ 11. Nor does the stipulation of discontinuance indicate that Doe dismissed her case as a result of a settlement, and neither she nor her father so-claimed.

167. The real reasons for the dismissal are clear. The Buzbee Defendants knew their conspiracy to extort Carter had failed and that based on, among other things, the NBC Interview, Doe and her story would not stand up to scrutiny. Defendants were now fearful that they were going to be sanctioned for filing a frivolous lawsuit, and Buzbee would be sanctioned by Judge Torres for litigating Doe's lawsuit without being admitted to the SDNY, so they fabricated a story and strong-armed Doe into dismissing her suit. In truth, had Doe agreed to dismiss her lawsuit on or about the purported February 4, 2025 "negotiated dismissal," Fortney would not have needed to meet with Doe to convince her to drop her lawsuit on February 13, 2025.

168. Further, Carter's counsel made clear to the Buzbee Defendants that Carter would never settle Doe's lawsuit or pay any money to resolve it. Carter's counsel also made clear that he would not dismiss Carter's lawsuit against Buzbee in California.

169. Thus, the threats of extortion and further defamation continue to this day, necessitating that Carter take action to prevent unscrupulous actors from further preying on him.

## X. Carter Was Severely Injured By Defendants' Misconduct

170. Doe's malicious lawsuit, and its demonstrably false allegations that Carter raped her, caused Carter to suffer actual and special damages, including, but not limited to, harm to his personal and professional reputation and harm to his business entity, Roc Nation—which resulted

in his business suffering no less than $20 million in losses, representing a minimum fee guarantee, while the full fee would have been $80 million had the contract been performed—in addition to out-of-pocket loss, and emotional harm, humiliation, and harassment. Carter, individually, is inextricably tied to his business Roc Nation, which he co-founded. He is the control person of a 50% owner of Roc Nation. Carter is Roc Nation. Damages to one constitute damages to the other. In an industry dominated by personalities and relationships, Doe's false allegations had the potential to cause—and in fact did cause—significant damages to Carter and his business interests. In addition, Roc Nation would have paid Carter a substantial fee for his services associated with the deal.

171. Furthermore, as intended, Defendants' filing inflicted tremendous harm to Carter's reputation that persists to this day. But the damage was not merely economic. Defendants' allegations emotionally devastated Carter and his children, wife, and family. As Carter stated in a recent interview in GQ Magazine: "That whole [lawsuit thing], that shit took a lot out of me. I was angry. I haven't been that angry in a long time, uncontrollable anger. You don't put that on someone—that's a thing that you better be super sure. It used to be like that. You had to be super sure before you put those kind of things on a person." *See* https://www.gq.com/story/jay-z-cover-interview-april-2026.

172. Defendants' actions also undermined Carter's relationships, and his company Roc Nation's relationships, with their businesses in the sports and entertainment industry. For example, in violation of Wikipedia's rules, Buzbee directed his employees to edit Wikipedia pages to enhance Buzbee's image and damage Carter's and Roc Nation's reputations. Users with an IP address directly linked to the Buzbee Law Firm made over 100 positive edits to Buzbee's Wikipedia page. It is undisputed that Roc Nation and Carter have significant and extensive agreements to produce

entertainment programs for certain sporting events. After Defendants filed Doe's lawsuit, the media reported that other businesses could end their deals with Roc Nation and that the lawsuit would likely force these business partners to speak out and address how the allegations would affect or even end their business relationship. This is exactly the result Defendants intended, banking on the fact that Carter would fear the reputational assassination, cave and pay.

173. As predicted, immediately after Buzbee and his co-conspirators went public with Doe's false accusations, Roc Nation and Carter lost other contracts in the sports and entertainment space that would have generated at least $20 million in revenue, representing a minimum fee guarantee, while the full fee would have been $80 million had the contract been performed. This is because Roc Nation is essentially an extension of—and inseparable from—Carter's personal brand and image. Indeed, at trial, Plaintiff will present evidence demonstrating how the extortionate scheme, and the false complaint filed in New York, resulted in the loss of business opportunities to him, personally; and have served to preclude him from new business opportunities across different industries.

174. Moreover, as a result of Defendants' filing of the false lawsuit and other false public statements against Carter, Carter was denied a $55 million personal credit line.

175. Also as a result of Defendants' filing of the false lawsuit and other false public statements against Carter, Carter's 50% owned consumer brand business, with which Carter is publicly closely associated, was also denied a $115 million loan.

176. As to the loss of proceeds to Roc Nation, Carter will demonstrate how those losses have directly impacted him financially—opportunities that existed before are now foreclosed. These quantifiable losses were directly caused by, and connected to, the false filing in New York federal court.

177. Finally, social media commentary online responding to Buzbee's public statements about Carter and accusations against Carter has caused him harm. For example, people have said "I can't wait until you join [Combs] in prison. Then later in hell," "He needs to be in jail . . . ," "Jay-z needs to be locked up," "Jay Z about to go down," "ALL OF YOU at Roc Nation, Jay Z…ALL OF YOU ARE GOING DOWN, just wait and see," and "Lock Jay Z up!" Other comments have accused Carter of being a "satanist," a "trafficker," a "terrorist" and a "monster," called Carter the N-word and threatened violence against Carter and his wife, including to "kill" or "execute" them.

178. Social media data shows that, as of May 5, 2025, Defendants' case and the allegations against Carter have generated 1.3 million mentions and had the potential to be viewed nearly 15 billion times based on associated user data.[17] The Net Sentiment Score—a metric used to capture whether sentiment about a person, entity or story is positive, negative or neutral—for that content regarding Carter is 94% negative. And although Carter's Net Sentiment Score was only 40%-41% negative in 2022 and 2023, his Net Sentiment Score rose to 79% negative since Doe made her false allegations against Carter.

179. Buzbee, Doe, and their co-conspirators must answer for all of this.

## **<u>CONSPIRACY ALLEGATIONS</u>**

180. Defendants are jointly and severally liable as co-conspirators for the harm inflicted on Carter.

181. Defendants agreed and worked together and planned, and knowingly and willfully conspired, to maliciously prosecute and defame Carter. Defendants agreed to initiate and continue

---

[17] In fact, one X post published by Pop Base, *NBC News reports that Jay-Z has been accused of raping a 13-year-old girl with Diddy in 2000,* has been reposted 44,000 times and "liked" 218,000 times. Pop Base (@PopBase), X (Dec. 8, 2024, 6:47 PM), http://x.com/PopBase/status/1865906002161549685.

the false and malicious lawsuit and to conduct the Texas Interview in the shared objective of extorting Carter through false and damaging accusations, thereby causing harm to his reputation and financial wellbeing.

182. In doing so, Defendants intended to harm Carter. Each and every one of Defendants took an overt act or acts in furtherance of their malicious prosecution of Carter:

a. Defendant Buzbee, as Doe's attorney, filed the Underlying Action against Carter and other entities, knowing the claims were fabricated or recklessly disregarding the truth that the claims were fabricated;

b. Defendant Fortney, as an attorney representing Doe, assisted in pursuing the Underlying Action and was complicit in the unlawful purpose of extorting Carter;

c. Defendant Buzbee and Defendant Fortney continued to prosecute the meritless Underlying Action even after each was confronted with further evidence of its falsity, demonstrating their collective intent to harm Carter;

d. The Curis Defendants allowed the Buzbee Defendants to improperly use Curis's ECF credentials to, among other things, file Doe's complaint against Carter, which Buzbee signed, because the Buzbee Defendants were not authorized to practice law in SDNY.

e. Defendant Buzbee and Defendant Fortney facilitated and planned the defamatory Texas Interview, including, on information and belief, paying Doe to travel to Texas for the Texas Interview and coordinating with NBC to conduct the Texas Interview; and

f. Defendant Doe actively participated in the formulation of and prosecution of false claims against Carter in the Underlying Action and made even more egregious, false allegations against Carter during the Texas Interview.

183. The conduct of these Defendants caused Carter's harm. Defendants' collective conduct, including their malicious prosecution, was intentional and calculated to cause Carter's injury. Their conspiracy was executed to extort money from Carter and to damage his personal, professional, and business reputation.

## CAUSES OF ACTION

### First Cause of Action
### (Malicious Prosecution Against All Defendants)

184. Carter repeats and realleges the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

185. On October 20, 2024, six days after Doe retained AVA Law and without meeting each other in person, Defendants filed a Complaint in federal court. Defendants alleged facts that they knew were false.

186. On November 5, 2024, Doe, through her attorney Buzbee, sent Carter an extortionate letter threatening to publicly assert wild, horrific, but utterly false allegations that Carter raped a minor after the 2000 VMAs. According to Doe and Buzbee, if Carter wished to avoid the financial and personal devastation that such public allegations would inflict, he would need to work out a deal to pay her off. Defendants thus filed the Underlying Action to force Carter into either: (a) paying "something of substance" to stop her from making public the wildly false allegations of rape that would subject Carter to opprobrium and irreparably harm his reputation, family, career, and livelihood; or (b) endure that financial and personal ruin.

187. After Carter refused to capitulate to these extortionate demands, Defendants made good on their threat and, on December 8, 2024, formally named Carter a defendant in the pending lawsuit they filed weeks earlier.

188. The Underlying Action was meritless and lacked probable cause. Defendants alleged facts that were obviously false and refutable. Not only do the facts of the time and place of the alleged rape defy logic and common sense, but a simple Google search reveals their falsity.

189. No person of ordinary care and prudence could believe Doe's allegations, as evidenced by NBC News's immediate doubt of her allegations and investigation into publicly available facts that both disproved Doe's allegations and directly contradicted her claims.

a. Doe alleged that the VMA after party occurred at "a large white residence with a gated U-shaped driveway" that was "approximately twenty minutes" from the VMAs by car, but photographs show that Carter attended a party at Lotus, a night club in New York City;

b. Doe alleged that her father drove to pick her up after the alleged rape: a ten-hour round trip to retrieve his 13-year-old daughter from a random gas station. When asked, her father had no recollection of doing so;

c. Doe alleged that she spoke to certain celebrities at the alleged party. When pressed for the names of the celebrities, Doe could only name one person, but that individual was in Chicago that evening performing a concert;

d. Doe alleged that she watched the VMAs on a jumbotron, despite the fact that photographs from the evening show no jumbotrons and that New York City denied MTV the permit to display one that evening; and

e. Doe alleges that she "approached limousine drivers" at the VMAs, despite video proof that the limousine area was cordoned off by police and inaccessible to fans.

190. Defendants acted with malice in initiating and prosecuting the meritless lawsuit against Carter for the improper and ulterior purpose of using it to obtain a collateral advantage in their ongoing malicious scheme to blackmail, extort, and intimidate Carter, to cause harm to Carter's reputation, and to insulate their knowingly false and defamatory statements about Carter.

191. The Underlying Action was terminated in Carter's favor and without settlement when Defendants filed a notice of voluntary dismissal and dismissed the action with prejudice. *See Doe v. Combs*, No. 24-cv-7975 (S.D.N.Y.), ECF No. 91.

192. The lawsuit filed by Defendants, and its demonstrably false allegations that Carter raped Doe when she was a minor, caused Carter to suffer actual and special damages, including, but not limited to, harm to his personal and professional reputation, harm to his business entity, Roc

Nation—which resulted in his business suffering $20 million in losses, representing a minimum fee guarantee, which would have been many millions of dollars higher had the contract been performed—out-of-pocket loss, and emotional harm, humiliation, and harassment. Moreover, as a result of Defendants' filing of the false lawsuit and other false public statements against Carter, Carter was denied a $55 million personal credit line. Also as a result of Defendants' filing of the false lawsuit and other false public statements against Carter, Carter's 50% owned consumer brand business, with which Carter is publicly closely associated, was also denied a $115 million loan. In addition, Roc Nation would have paid Carter a substantial fee for his services associated with the deal.

193. Defendants' initiation and continued prosecution of the frivolous lawsuit was willful and malicious and was intended to oppress and cause injury to Carter. Accordingly, Carter is entitled to an award of all damages available under the law, including compensatory damages, special damages, and punitive damages.

**Second Cause of Action**
**(Judiciary Law § 487 Against the Buzbee Defendants and the Curis Defendants)**

194. Carter repeats and realleges the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

195. New York Judiciary Law § 487 imposes civil liability on any attorney who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party." The Buzbee Defendants and the Curis Defendants engaged in precisely such conduct within the territorial limits of New York.

196. At all relevant times, the Buzbee Defendants and the Curis Defendants were licensed attorneys acting in that capacity. In the Underlying Action, they served as counsel of record for Doe and, in that role, signed and caused to be filed pleadings and submissions before the Court—

including the initial Complaint, the Amended Complaint, and letters to the Court—each of which was undertaken in their professional capacity and during the pendency of an active federal action.

197. The Buzbee Defendants and the Curis Defendants engaged in repeated, affirmative acts of deceit upon the Court by filing false allegations and affidavits containing false statements.

198. By signing and filing the Complaint and the Amended Complaint, the Buzbee Defendants and the Curis Defendants certified to the Court that, after a reasonable investigation, the factual allegations in those pleadings had evidentiary support. That certification was false. The attorney defendants had not conducted a reasonable investigation into Doe's allegations before filing them in federal court.

199. The Buzbee Defendants and the Curis Defendants nevertheless filed an Amended Complaint containing knowingly false allegations that Carter raped a minor—an allegation they knew to be false.

200. The falsity of the allegations is confirmed by overwhelming, contemporaneous evidence: documented records placing Carter at an entirely different venue on the night in question; publicly available tour schedules establishing that Doe's purported witnesses were nowhere near New York at the relevant time; Doe's own father having no recollection of picking her up after the supposed incident; and verifiable physical and logistical facts—including the layout of the VMAs venue, the existence of the alleged large public viewing screen, the supposed accessibility of limousines to members of the public, and the implausibility of a residential home matching Doe's description within a 20-minute drive from Radio City Music Hall—that are flatly contradicted by readily available records. The deceitful intent of the Buzbee Defendants and the Curis Defendants is further confirmed by other instances in which prospective claimants have reported being

pressured by Buzbee to shape or expand allegations they were uncomfortable making. *See Carter v. Buzbee Law Firm*, Case No. 24SMCV05637 (Sup. Ct. Cal. Dec. 20, 2024), Dkt. No. 10 ¶ 70.

201. Buzbee also committed deceit on the court by implicitly representing in each filing that he was authorized to appear in the Southern District of New York, a representation he knew to be false. By filing under cover of Curis's ECF credentials, Buzbee deliberately sought to evade the Court's gatekeeping function, the constraints of Rule 11, and the Court's disciplinary authority over the attorneys appearing before it. That conduct is "deceit" upon "the court" that Judiciary Law § 487 is designed to punish.

202. Fortney also made a knowingly false statement to Doe, a party in the litigation, when he baselessly told her that she needed to dismiss the case because Carter had threatened her life. That fabrication was a calculated lie designed to manipulate Doe's decision-making and the trajectory of the litigation, including by manufacturing a pretext to dismiss the very lawsuit the Buzbee Defendants and the Curis Defendants never should have filed.

203. As a direct and proximate result of the Buzbee Defendants' and the Curis Defendants' deceit, Carter has suffered substantial actual damages, including, without limitation, the attorneys' fees and costs incurred in defending against the fraudulently filed and prosecuted claims, severe and lasting reputational harm, and other consequential damages, all in amounts to be proven at trial and subject to trebling under Judiciary Law § 487.

**<u>Third Cause of Action</u>**
**(Defamation Against Doe)**

204. Carter repeats and realleges the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

205. Doe has made (and continues to make) false and defamatory statements to and through third parties, including, but not limited to, major media outlets, through her attorneys, on

social media platforms, and during public interviews, accusing Carter of raping her. Doe's false and defamatory statements during the Texas Interview went far beyond the four corners of her complaint, and were widely disseminated to the general public through national media outlets, social media platforms, and during public interviews. Doe did not publicly retract the libelous statements made against Carter within 10 days of their publication, or at any time thereafter.

206. Far from regurgitating her complaint, during the Texas Interview, Doe leveled new, more serious allegations against Carter during the interview. For instance, Doe stated, for the first time, that she had been ***"fighting trying to get away from [Carter] and he put his hand over my mouth and told me to stop it—you know, stop it, cut the BEEP."*** These defamatory allegations were new and not made in Doe's complaint against Carter in the Underlying Action. She also provided other, previously undisclosed, details about herself and her "encounter," including that she:

a. Is "A 38-year-old mother from Alabama."

b. Allegedly went to the VMAs "to catch a glimpse of her favorite celebrities."

c. Was not scared to be alone in New York because "with having autism, is—like feeling you live your life in a shatter-proof, juggle ball. The world's on fire, the fire is inside the ball with you, but there's no way for you to get out."

d. "[S]uffered a head injury."

e. "The night of the 2000 VMAs . . . a friend drove her from Rochester, New York to Manhattan."

f. Believed Mr. Combs's limo driver attempted to convey that she "was just pretty."

g. Talked "to Benji Madden about his tattoo because you know, I have a—he has about his tattoo that's the Last Supper, because I have a religious background, so it was just something to talk about."

h. Had to "seek medical treatment due to the stress."

207. In fact, even after NBC News exposed her new, false allegations during her interview, Doe stated that "she stands by her statements" and that "what is the clearest is what happened to me."

208. Doe knowingly made her false statements and, at a minimum, made them with a reckless disregard as to their falsity as demonstrated by NBC News's ability to quickly uncover inconsistencies in Doe's allegations and contradictory evidence. Worse, when pressed about the inconsistencies, she admitted her statements contained numerous inaccuracies and, in some instances, were random guesses as to the key details. Doe thus acted with actual malice when she knowingly and intentionally published false allegations accusing Carter of rape.

209. Notwithstanding the falsity of her allegations, Doe relied on NBC News and other sources to republish and further disseminate—indeed, to amplify—the defamatory statements she made about Carter during the Texas Interview to the public, despite knowing that providing such statements to media outlets would disseminate her false statements about Carter.

210. Doe's accusations were neither speculative nor innocuous, but asserted by Doe as a matter of fact to lead a reader or viewer to conclude that Carter committed the heinous criminal acts she alleged. Indeed, the Underlying Action is barely mentioned during the broadcast.

211. Doe's false statements during the Texas Interview, and the plan she concocted with her attorneys to use national news media networks, such as NBC News, to disseminate those false statements to millions, were a part of Defendants' calculated plan to falsely accuse Carter of rape and inflict maximum reputational harm on him to induce payment.

212. Doe's false statements are defamatory per se as her inflammatory statements and false accusation that Carter committed crimes of moral turpitude subjected Carter to disgrace, ridicule, public hatred, and contempt.

213. Carter was directly injured by Doe's false statements, including, but not limited to, the deterioration of his public image, reputation, and professional relationships, and the loss of business opportunities, due to the public contempt and hatred caused by Doe's false statements.

214. Doe's false statements also constitute defamation *per quod*:

a. Doe's false statements were made as matter-of-fact statements that were reasonably understood to have been made about Carter;

b. Doe's false statements to social media networks, including her NBC News interview, implicated Carter in allegations of criminal sexual misconduct, including rape; and

c. The statements made by Doe during the Texas Interview were known to millions of readers and viewers of Doe's statements which injured Carter in his occupation as a performer and businessperson; for example, Doe's false statements and actions undermined Carter's ability to maintain professional relationships, secure business opportunities, and preserve his reputation by exposing Carter to disgrace, ridicule, public hatred, and contempt.

215. Doe's statements during the Texas Interview were not a fair report of the Underlying Action. Doe was not reporting on a judicial proceeding; she was the source of the accusation. She voluntarily appeared on national television, spoke in her own voice, presented herself as a victim, and personally accused Carter of rape.

216. Nor did Doe merely repeat allegations from her complaint. She added new, more graphic accusations that were not in the Underlying Action, including that she was "fighting trying to get away from [Carter] and he put his hand over my mouth," and that Carter "told me to stop it—you know, stop it, cut the BEEP." She also added new supposed details to bolster her story, including statements about her autism diagnosis, head injury, medical treatment, Benji Madden, the alleged friend who supposedly drove her to New York, and her father's alleged conduct after the supposed rape. These were new factual assertions, not reports of judicial allegations, and they materially expanded the false accusations against Carter.

217. Carter has suffered assumed and actual damages, including, but not limited to, loss and injury to his business, harm to his name and reputation, out-of-pocket loss, emotional harm, humiliation, and embarrassment.

218. Doe's false statements were a substantial factor in causing Carter's harm.

219. Doe acted with constitutional malice. Doe either knew that her statements against Carter were false or acted with reckless disregard for the truth.

220. Even upon having sufficient grounds to withdraw her false statements against Carter, with the release of the NBC News Article, Doe continued to threaten, through her attorney, Buzbee, criminal prosecution against Carter and maintain the Underlying Action.

221. And Doe still has not stopped. As recently as April 11, 2025, Doe made a post on TikTok with a lip-synched audio track stating that: "you couldn't pay me a million dollars to get an apology video out of me, I stand on what I said, fuck you."[18] By refusing to apologize, and continuing to "stand on what [she] said," despite all the evidence and, indeed, her own admissions to the contrary, Doe continues to display a shocking and reckless disregard for the truth that is both intentional and malicious.

222. Doe never had any reasonable grounds to support any truth in her statements and acted with reckless disregard for the truth. In other words, she lied. Tellingly, even after recanting portions of her complaint in the Texas Interview, when pressed to come forward with the truth, she refused. Instead, Doe responded: "how does this help me?"

223. Accordingly, Carter is entitled to an award of all damages available under the law, including compensatory damages, special damages, and punitive damages.

[18] Carter is not including a citation to Doe's TikTok page because the hyperlink includes identifying information. Carter will provide the hyperlink to the Court upon request.

## PRAYER FOR RELIEF

WHEREFORE, Shawn Corey Carter respectfully prays for judgment and relief against Jane Doe (as to the First and Third Causes of Action) and Anthony Buzbee, David Fortney, Anthony G. Buzbee LP (d/b/a The Buzbee Law Firm), Antigone Curis, and Curis Law, PLLC (as to the First and Second Causes of Action) as follows:

1. An award of assumed and actual damages, in an amount to be determined by the finder of fact;
2. An award of treble damages pursuant to Judiciary Law § 487;
3. An award of punitive damages;
4. Reasonable costs and legal fees pursuant to applicable law;
5. Pre- and post-judgment interest as applicable; and
6. Any other relief the Court deems just and proper.

Dated: July 29, 2026
New York, New York

By: *Jordan W. Siev*
Jordan W. Siev
Casey D. Laffey
REED SMITH LLP
599 Lexington, 22nd Floor
New York, New York 10022
jsiev@reedsmith.com
claffey@reedsmith.com
212-205-6085

By: *Roberta A. Kaplan*
Roberta A. Kaplan
Ellen V. Holloman
Christopher R. Le Coney
KAPLAN MARTIN LLP
1133 Avenue of the Americas,
Suite 1500
New York, New York 10036
rkaplan@kaplanmartin.com
eholloman@kaplanmartin.com
cleconey@kaplanmartin.com
212-316-9500

By: *Alejandro Brito*
Alejandro Brito
*(Admitted PHV)*
BRITO PLLC
2121 Ponce de Leon Blvd,
Suite 650
Coral Gables, Florida 33134
abrito@britopllc.com
305-614-4071

*Attorneys for Plaintiff*
*Shawn Corey Carter*