EXHIBIT 1

**Declaration of [redacted]**

I, [redacted] declare pursuant to 28 U.S.C. § 1746 as follows:

1. As discussed further below, Shawn "Jay-Z" Carter never raped me. I have never met or spoken to Mr. Carter. Mr. Carter never engaged in any inappropriate conduct toward me whatsoever.

2. I have reviewed this Declaration. I swear under penalty of perjury that it is true, accurate, and complete. I make this Declaration voluntarily and on my own free will. I have received no monetary consideration, payment, or other financial compensation of any kind from Mr. Carter, or anyone acting on his behalf. I have not received or been promised any monetary compensation in connection with providing this Declaration.

3. Everything in this Declaration is based on my personal knowledge. My independent counsel, J. Blair Newman, Jr., Esq. of McDowell Knight Roedder & Sledge, LLC, has advised me in connection with this Declaration, and we have reviewed and discussed it together prior to my signing below.

## I. My Allegations Against Shawn Corey Carter Were False

4. I have never met or spoken to Mr. Carter. Mr. Carter never engaged in any inappropriate conduct toward me. My claims that Mr. Carter and Mr. Combs raped me while a third celebrity, [redacted] watched are false. There is no truth to any of my claims against Mr. Carter.

5. I understand my false accusations have caused Mr. Carter immense pain, suffering, and damage that can never be fully undone. I have waived attorney-client privilege, work product protection, common interest protection, and any other applicable privilege, protection, or immunity from disclosure, discovery, or use. This waiver covers: (a) all

communications with and among the attorneys that appeared on my behalf in the New York Lawsuit; and (b) all information, documents, work product, and other materials of any kind, in any form or medium (including electronically stored information), created, received, obtained, developed, or maintained by those attorneys. This waiver also includes my communications with Reciprocity Industries, which I understand is a call center. This waiver does not extend to my communications with, or the attorney work product of, McDowell Knight Roedder & Sledge, LLC, including its attorneys (including J. Blair Newman Jr.), paralegals, staff, and other personnel.

**II. The Facebook Ad**

6. Sometime in late September 2024 or early October 2024 when I was on Facebook, I saw an ad looking for people who might have sexual assault claims against Sean Combs. The ad triggered memories of being raped when I was 13 years old.

7. I clicked on the ad, which took me to a form for AVA Law Group ("AVA Law"). I filled out the form. I do not remember exactly what information I provided.

8. After I submitted the form, someone from AVA Law called me to talk about my claims. I remember only having that one phone call with AVA Law.

9. During that call, I told AVA Law that I was a model and that I attended an afterparty following the Teen Choice Awards in 2000 in New York City. I did not bring up the MTV Video Music Awards during my only call with AVA Law.

10. While AVA Law asked about the harm I had suffered from the incident I recounted, no one from AVA Law ever asked about the remainder of my medical history, psychological history, or whether I had ever accused anyone else of sexual misconduct.

11. Around October 13, 2024, AVA Law sent me a representation agreement that included a medical release form. They did not explain to me why they needed the medical release. On October 13, 2024, I signed the agreement and medical release through Docusign anyway.

12. I now see that the representation agreement provides that The Mattar Firm, P.C. was also my attorney. I never spoke with anyone from The Mattar Firm or otherwise heard of The Mattar Firm until long after my New York Lawsuit was dismissed.

13. After signing the representation agreement, I received only a few mass emails that AVA Law also sent to many of its other clients.

**III. The October Complaint**

14. On October 20, 2024, a complaint was filed on my behalf by Tony Buzbee and David Fortney of the Buzbee Law Firm and Antigone Curis of Curis Law PLLC ("Curis Law") using the name "Jane Doe" as plaintiff against Sean "Diddy" Combs and several unnamed "Doe" defendants (the "October Complaint"). The case is captioned *Doe v. Combs*, No. 24 Civ. 7975 (the "New York Lawsuit") and was filed in the United States District Court for the Southern District of New York. One of the unnamed "Doe" defendants in the October Complaint was Shawn Corey Carter, who is professionally known as Jay-Z. Mr. Carter was later formally named as a defendant.

15. I was never provided with a draft of the October Complaint before it was filed. To the best of my knowledge, I did not provide authorization for filing the October Complaint and did not even know who Mr. Buzbee, Mr. Fortney, the Buzbee Firm, Ms. Curis or Curis Law were on October 20, 2024. To this day, I have never met or spoken to Ms. Curis.

16. To my knowledge, other than speaking with me, Mr. Buzbee, Mr. Fortney, Ms. Curis and the other lawyers filed the October Complaint without conducting any independent investigation, background inquiry, or due diligence, and without obtaining any corroboration of the allegations in the October Complaint.

17. Other than my one call with AVA Law in early October 2024, I do not recall anyone interviewing me or discussing my claims with me before the October Complaint got filed. In fact, I did not know that the October Complaint had even been filed until weeks later.

18. The October Complaint alleges that Mr. Carter and Mr. Combs raped me when I was a minor while an unnamed celebrity watched. As discussed above, these allegations were false.

## IV. The Buzbee Law Firm

19. I believe that my first contact with the Buzbee Law Firm was with an attorney named David Fortney, who I spoke to by phone a couple weeks after I spoke to AVA Law. I do not have a signed engagement letter with the Buzbee Law Firm and I have no recollection of signing one.

20. The Buzbee Law Firm sent Mr. Carter a demand letter in November 2024. I never saw the letter prior to 2026. I only recently learned that Mr. Buzbee sent the demand letter after Mr. Buzbee and Mr. Fortney had already filed the October Complaint against Mr. Carter on my behalf (even though he was not sued by name at that time).

21. Tony Buzbee and David Fortney of the Buzbee Law Firm were my lawyers in connection with the New York Lawsuit. Mr. Fortney was the main Buzbee Firm attorney I communicated with. I had only one approximately 10-minute meeting with Mr. Buzbee at a coffee shop on December 8, 2024 or December 9, 2024 (discussed below) and a call with him on

March 11, 2025 after the New York Lawsuit was dismissed (also discussed below). I had a few interactions with a lawyer at the Buzbee Firm named Colby Holler in February 2025 after the New York Lawsuit was dismissed.

22. I have since learned that Mr. Buzbee was not admitted to the United States District Court for the Southern District of New York. At no point was I ever told that the Judge in my case raised any questions or concerns about Mr. Buzbee's admission to the court, that Mr. Carter had filed a motion to sanction Mr. Buzbee, or that I should consider retaining independent counsel.

**V. My November 18, 2024 Declaration**

23. I spoke to Mr. Fortney on November 18, 2024, about a month after the October Complaint was filed. During that call, Mr. Fortney discussed with me that the October Complaint had been filed on my behalf. I was not aware that the October Complaint had been filed prior to that call.

24. Following the call, Mr. Fortney sent me a draft declaration via Docusign. In the transmittal email, Mr. Fortney stated: "thanks for taking my call earlier today and going through your complaint. I have attached the declaration here, verifying that the allegations in the complaint are true. Please go ahead and review / sign. Thanks very much." I did not understand at the time that I was being asked to sign a declaration that related to allegations in the October Complaint, which unbeknownst to me had been filed about a month prior.

25. I quickly scanned the declaration and signed it approximately six minutes after receiving it. No one explained why they were asking for the declaration. No one explained the consequences of submitting a false declaration at that time.

26. On that same day, my car also broke down. I was so distraught that I texted my mother, "2592 is how much it will take so I'm just screwed and losing again why can God not just put me out of this misery."

27. I now understand that November 18, 2024—the same day Mr. Fortney asked me to sign the declaration—was also the day Mr. Carter filed a lawsuit against Mr. Buzbee in California alleging that Mr. Buzbee extorted and defamed Mr. Carter in connection with my allegations. No one told me about Mr. Carter's lawsuit when requesting the declaration, or at any time afterward. No one told me that I was at risk of being sued by Mr. Carter, or that I should obtain independent counsel.

28. At some point in either October or November 2024, which was well before the December Complaint was filed, I had told Mr. Fortney about my mental health conditions. I told him that I am [redacted] He never asked any questions about whether this affected my memory and recollection of the allegations in the October Complaint.

VI. **My Trip to Houston, Texas**

29. In late November 2024, Mr. Fortney asked me to travel to Houston, Texas to sign some legal documents and do an interview with NBC News. I traveled to Houston on December 4, 2024 and returned to Alabama on December 10, 2024. The Buzbee Law Firm paid for my flights, meals and hotel.

30. While I was in Houston, Mr. Fortney gave me $200 in cash for spending money.

31. Mr. Fortney took me to a top-ranked barbecue restaurant in Houston. On December 7, 2024, Mr. Fortney took me shopping to get camera ready. He helped me pick out an outfit for the interview with NBC News, which he paid for.

32. Mr. Fortney told me he wanted to make me the public face of the cases against Sean "Diddy" Combs. At that time, I also understood from Mr. Fortney that I would have to testify at Mr. Combs' criminal trial. I never intended to press criminal charges against Mr. Carter. I also never told Mr. Buzbee or anyone else that I was thinking about pressing criminal charges against Mr. Carter.

33. I was struck by Mr. Fortney's generosity. On December 7, 2024, I wrote my mother stating, "I'm going to try to make sure I come back with some cash I mean jeez who spends that kind of money in a day or week they keep saying let them know if I need more cash and I'm like after you just took me shopping this one guy david they have made it his job to show me around and get me camera ready and all this other stuff like miss congenitally . . . ."

34. On or before December 7, 2024, Mr. Fortney and I discussed for at least the second time that I was facing [redacted]

35. I spoke to Mr. Fortney several times on December 8, 2024. On that day, Mr. Fortney emailed me a link to a YouTube video of the 2000 MTV Video Music Awards. He asked me only one question: to try and find myself in the crowds outside the venue. I watched the video but could not find myself in the crowd. I told Mr. Fortney I could not see myself in the crowd. He never asked me any follow-up questions.

36. Mr. Fortney also had me sign a declaration that day saying my allegations against Mr. Carter and Mr. Combs were true. Mr. Fortney never told me why I needed to sign the

declaration, explained its contents, or explained the legal consequences of not telling the truth in the declaration. Mr. Buzbee and Mr. Fortney filed an amended complaint naming Mr. Carter as a defendant later that day (the "December Complaint"). I provided the names of my father and the friend who drove me to New York City to the Buzbee Firm, but no one asked me for proof of my allegations, or other corroborating witnesses.

37. Before the NBC News interview, but after I signed my second declaration and after the December Complaint was filed, my father told me that he had spoken to Mr. Fortney on the morning of December 9, 2024. This was the first time my father spoke to Mr. Fortney about my allegations. My father told me that he was unable to corroborate picking me up from New York City after the 2000 MTV Video Music Awards. Mr. Fortney also told me that an individual named Chris Brown, who I had said drove me to New York City, had died in a car accident.

38. In paragraph 32 of the December Complaint that was filed against Mr. Carter, it states "Upon present information and belief, Jay-Z responded to said [November 2024 demand] letter by not only filing an utterly frivolous lawsuit, but by also orchestrating a conspiracy of harassment, bullying and intimidation against Plaintiff's lawyers, their families, employees and former associates in an attempt to silence Plaintiff from naming Jay-Z herein. This effort was meant to scare Plaintiff and to discredit her counsel. That effort failed. Indeed, Plaintiff chose to file this amendment as a result of the egregious conduct perpetuated by Carter." That statement is not true. I was never told anything about Mr. Carter threatening or harassing Mr. Buzbee's family or his firm, and nobody ever told me that statement was in the complaint.

39. Before the NBC News interview, Mr. Fortney coached me on how to act and what to say. I told my mom, "so it's a lot of exposure and a lot of grooming a lot of coaching on the way to say things the way to look all of that."

40. On the day of or the day before the NBC News interview, I met Mr. Buzbee for the first and only time at a coffee shop in Houston. Mr. Fortney was there too. Mr. Buzbee gave me $1,000 in cash for myself and my family. The meeting lasted about 10 minutes. There was nothing of substance discussed, mostly just pleasantries, although I do recall that Mr. Buzbee only spoke about Mr. Carter, not Mr. Combs. This was the first and only time I ever met or spoke with Mr. Buzbee in 2024 and before the dismissal of the New York Lawsuit on February 14, 2025.

### VII. The Fallout

41. After I did the NBC News interview, Mr. Fortney traveled to Alabama to meet with me on December 13, 2024. We discussed discrepancies that had come up with some of the things I had said during the NBC News interview.

42. Following the NBC News interview, Mr. Fortney arranged for me to sit for a polygraph test on or around December 16, 2024. Mr. Fortney was present at the testing facility. I never learned the results of the polygraph.

### VIII. Dismissal

43. In January 2025, I began to doubt my claims against Mr. Carter. I also began doubting that I ever went to a party with celebrities, and that Mr. Combs or [redacted] were involved in any attack on me.

44. I believe I told Mr. Fortney by phone that I had begun to have doubts about my claims against Mr. Carter. I told him I did not want to continue with the case in any way. I believe that the call occurred in late January 2025.

45. Mr. Fortney came to my home in Alabama on February 13, 2025. I do not believe I had spoken with him since our phone call in January. When he arrived, he stayed in his car. I

went outside to meet him. He told me they were going to dismiss the case, but did not explain why. He said it was possible that Mr. Carter or people connected to him could find out my name and address. He said it was dangerous to speak about the case at all. He gave me a document to sign that he said to me was needed to dismiss the case. I signed it while we were still sitting in his car. He did not explain the document to me, or give me a copy.

46. I never received any threat from Mr. Carter or anyone acting on his behalf.

47. No one at the Buzbee Law Firm or any other law firm ever told me about a possible settlement of the New York Lawsuit. I did not authorize a settlement. I only agreed to dismiss the New York Lawsuit after speaking with Mr. Fortney in Alabama on February 13, 2025. I did so without expecting or being promised anything from Mr. Carter or anyone acting on his behalf.

## IX. My Conversation With the Investigators

48. On February 21, 2025, two investigators visited my house. Although I was surprised that those investigators knew who I was and where I lived, I spoke with those investigators briefly about the New York Lawsuit and my claims against Mr. Carter, which I had dropped. I spoke with the investigators outside of my house.

49. I have reviewed the transcript of the conversation I had with the investigators. The transcript is, to the best of my recollection, a true, accurate, and complete portrayal of that conversation. My statements to those investigators that Mr. Carter did not rape me were accurate and truthful.

50. Mr. Buzbee called me on March 11, 2025 to discuss my conversation with the investigators. After the call, I agreed to Mr. Fortney's request that he could release the recording

of our call. Had Mr. Buzbee told me that releasing the recording was only for his benefit, and not mine, I would never have permitted him to record me, let alone release the recording.

I hereby declare under the penalty of perjury that the foregoing statements are true and correct. Executed on this 24 day of September, 2026 in Mobile, Alabama.

By [redacted]